JUDGE PETERS
delivered the opinion op the court:
By an order of the Grant county court, made at its December term, 1857, a paper, purporting to be the last will and testament of Charles Sechrest, deceased, bearing date the 3d day of November, 1855, was admitted to record.
From that order the present appellees appealed to the Grant circuit court, where an issue of ildevisavil vel non” was submitted to a jury, who found said paper not to be the true last will and testament of said Sechrest; and, a judgment having been rendered in said court in conformity to the finding of the jury, Mary Sechrest and others, the chief beneficiaries in said paper, have appealed to this court.
The case has been very fully argued by counsel; and, after having carefully examined and considered it, we will endeavor to stateour conclusions upon the points involved, without elaboration.
It is important, first, to determine whether there is sufficient proof of the publication of the instrument according to the forms and solemnities required by law.
Sec. 5, chap. 106, Rev. Statutes, (2 vol. 458,) provides, that “no will shall be valid, unless it is in writing, with the name of the testator subscribed thereto by himself, or by some other person in his presence, and by his direction; and, moreover, if not wholly written by the testator, the subscription shall be made, or the will acknowledged, by him, in the presence of at least two credible witnesses, who shall subscribe the will with their names in the presence of the testator.”
J. J. Henderson andB. N. Carter are the subscribing witnesses to the instrument, and B! N. Carter was the draftsman.
Henderson proves that he was sent for to go to the house of Mr. Charles Sechrest. Upon his arrival he was conducted into a room, where he found B. N. Carter, with some papers before him on a stand, or table. In a few minutes after he entered *166 the room Charles Sechrest came in. and Carter, taking the contested paper in his hand, handed ' it to him, (Henderson,) and said to him, Mr. Sechrest wants you to attest his will. He then asked Sechrest if it was his will? He answered, it was; and “said that was the way he wanted his property divided.” That he, (Henderson,) then said he must read the paper first, and'Sechrest replied, that was right; and, alter having read a clause or two, to satisfy himself that.it was a will, he subscribed his name to it as a witness in the presence of Sech-rest and Carter. That Carter then told Sechrest to make his mark to it, which he did, and then Carter subscribed his name to it as a witness, in the. presence of Sechrest and himself.
In his cross-examination, Henderson stated that, after he had subscribed his name to the paper, “Carter made the old man's mark, and signed it himself;” but that discrepancy is not material, as the objection is made to the time when it was done, and not to the manner or by whom it was done. The foregoing is all the evidence in relation to that particular point, and the question arises, was that a sufficient publication, under the requisitions of the statute supra?
It may be assumed that the name of Sechrest had been written to the paper before Henderson ever saw it, and certainly before he attested it; his name is written out in full upon the paper as copied in this record, and the mark is placed between the Christian and surname. Henderson proves the mark was made after he subscribed it as a witness, but does not prove the name was written afterwards; he only proves that his name and Carter’s were written after he saw it. So that Sechrest’s name must have been subscribed to the paper before he saw it; and, after his name had thus been subscribed to the paper, he acknowledged it to be his will, in the presence of the two witnesses, who subscribed it as such — which was a compliance with the requisitions of the statute — and the placing the mark to it, whether by Sechrest or Carter, was wholly ■unnecessary.
But, even if the name of Sechrest was subscribed at the time he made his mark, or after Henderson had subscribed his *167 name as a witness, we apprehend it would have been sufficient.
We are not aware of any adjudication of the question since the adoption of the Revised Statutes; but, in Swift et ux vs. Wiley, (1 B. Mon., 114,) the point was directly before the court, under the statute of 1797 concerning wills, the provision of which in regard to the attestation of wills is the same in import and substance as the section, supra, of the Revised Statutes; and in that case it was held, that it was not material whether > the names of the attesting witnesses, or that of the testator» shall have been first subscribed, if the witnesses were present when the testator either wrote his name, or acknowledged it as his signature, and, being called on for that purpose, actually witnessed or attested that fact. Here the witnesses were both present when Sechrest acknowledged the execution of the instrument, and thej» attested the fact; which must be deemed sufficient.
It is again contended that the judgment of the circuit court is right because the proof does not show that the instrument was ever read to Sechrest; that he was illiterate, and could not read it himself, consequently he could not have known its contents, and it could not therefore be regárded as his will. It is certainly true that a testator ought to know the contents of his will, otherwise it could not be said to be his will. But it seems to us that the- evidence of Carter relieves the case of every difficulty on this point; for he states that he had a previous will of Mr. Sechrest, in the handwriting of Lewis Myers, by him when he did tlie writing, and that Sechrest told him to write the will like that, omitting the lands, as they had been deeded; and he did so. That he would write, read to him, (Sechrest,) and he would approve — obviously meaning that, as he would write a clause, or a paragraph, he would read it to Sechrest, and he approved what was written; and, in that way, the whole instrument, as we are authorized to conclude, was read to him, and he approved it.
Besides, the execution of the instrument by Sechrest, with the requisite solemnities, is presumptive evidence that he knew its contents, and that it conforms to his intentions; and it is in *168 cumbent upon those who seek to avoid it on the ground that it makes a disposition of his estate of which he at the time was not fully apprised or had no knowledge, to establish the fact aliunde, which in this case has not been done. (Shanks et al vs. Christopher et al., 3 A. K. Mar., 144; 1 Jarman on Wills.)
It is next argued by the counsel for appellees that the law was properly expounded to the jury in the instructions allowed by the circuit judge, and, as the evidence was conflicting upon the issue submitted to them, this court should not disturb their verdict.
What effect, (if any,) is to be given to the verdict of the jury, depends upon the construction to be given to sec. 28, chap. 106, 2 vol. Rev. Stat., 466, conferring jurisdiction on this court in will cases, by which it is provided that, “A writ of error or an appeal shall lie from the county court to the circuit court of the same county, and thence to the court of appeals, from evei-y order admitting a will to record, or rejecting it. The circuit court and court of appeals shall try both law and fact; but the court of appeals shall not hear or adjudge any matter of fact pertaining thereto, other than such as may be certified from the circuit court, &c.”
It is very clear, from the unambiguous language of this section, that the court of appeals is made the trier of the facts certified from the circuit court, without reference to, and wholly independent, of the finding of the jury; and, by applying the law to the facts, of which the court is made the sole trier, determine whether the testamentary paper should be admitted to probate, or be rejected; and, having determined that matter, the only thing to be done is to have the mandate entered in the circuit court, with directions to the county court to make such orders as may be proper and necessary to carry out the judgment of this court.
This exposition of the enactment, supra, conforms to the opinion of this court in the case of Overtones heirs vs. Overton's ex'r., (18 B. Mon., 61,) and to the manifest intention of the Legislature.
*169 Having disposed of the foregoing preliminary points we proceed to the consideration of the main question, which is: Had Charles Sechrest, at the date of the contested paper, sufficient mental capacity to make a valid disposition of his estate by will?
About sixty witnesses were examined as to the capacity of Charles Sechrest; thirty odd for the appellants, and twenty odd for appellees. The number is too great, therefore, to undertake a minute examination and analysis of the testimony of each witness; but, as the evidence of Carter, the draftsman of the paper and one of the subscribing witnesses, is relied upon by appellees as sustaining their side of the issue, and as, moreover, the part he acted and his position afforded to him a favorable opportunity to'inform himself as to the true mental condition of Charles Sechrest at the time the instrument was written, his testimony will be scrutinized with some care.
This witness states, in substance, that he became slightly acquainted with Charles Sechrest in 1848. That he occasionally called at his house and saw him, but had no particular conversation or transaction with him until he wrote the will. At that time his mind was about the same as he had seen it before; no material change was observed. He wrote some eight or nine deeds from the old man to his children, and had a wall of Mr. Sechrest before him, written by Lewis Myers, but did not recollect its contents. He had also before him plats of the different tracts ofland, and drew the deeds by said plats. The deeds were for the several tracts separately; the “Germany lands” were conveyed to the three boys; the home place was divided between his two daughters, the Mistress Lyons, and his youngest son George. That he was but little acquainted with the old man, and could not say much about his mind.
To the question asked him, whether in Ms opinion Mr. Se-chrest had intellect enough, at the time, to understand the business he was engaged in, he seems to have declined giving a direct answer, but proceeded to detail what occurred at the time, which was, in substance, that he seemed to fail in his memory about some of the items, and, in order to refresh his memory, the witness would read from the old will, write and *170 read to him, and he would approve. He proved, upon cross-examination, that he was a dull, ignorant man; seemed to be forgetful; that the names of his children, and the disposition of his property, would be suggested to him by hearing the witness read from the old will, and sometimes Mr. Sechrest would make suggestions himself; that he told him to write the will pretty much as the old will, which was before him, noting the lands which had been conveyed. He also proved that "he thought it doubtful if” the old man could have dictated the will which he wrote, without the aid of the Myers will, and his suggestions. . That he wrote on slips of paper, read to him. and he would acquiesce; the witness using the word acquiesce because, (as he expressed it,) that was the most appropriate “word to express the idea ”
If the witness had stated no other facts, the foregoing would perhaps have authorized the conclusion reached by appellants’ counsel. But in addition to these, he stated that the boys James and Nuck applied to him twice to go down and write their deeds, and Robert Lyons applied to him once; that he went each time he was applied to. The first time he went the old man seemed not to be in a good humor about the business; expressed his fears that if he made the deeds it would interfere with his will. Witness told him that his will could be written over, showing that the deeds had been made, and in a way so as not to interfere with his will. He did not, however, succeed until he made his third visit, and he was then only able to get the old man to yield by assurances that he could make the deeds, and then have a will written showing the facts, and thereby accomplish his fixed purpose of disposing of the balance of his property by will.
The Myers will, (as it was called,) was written by Mr. Lewis Myers, as he proves, between the years 1845 and 1849. From that period, until the writing of the deeds, it had been carefully preserved by Mr. Sechrest. From his conversations and conduct in relation to it, as proved by Carter, we cannot doubt that he recoiled ed its provisions and was entirely satisfied with it. By that will he had devised to his three sons James, Robert and Francis, the same lands which he subsequently *171 conveyed to them in the deeds written by Carter. He therefore manifested great unwillingness in any way to interfere with that will, for fear his fixed and cherished purpose would be defeated.
If Carter, after visiting Mr. Sechrest three times, and learning his plans and desires in regard to the Myers will, believed that he had not then sufficient mental capacity to make a valid will, or even regarded it as a doubtful question, but, notwithstanding, prevailed upon him to change or destroy that will, and to make the deeds and the second will, by assurances that his purposes would be as certainly effectuated in that way as by preserving the former will, the part he acted in the business cannot be approved, and but little weight should be given to his statements.
But, if he had even proved that at the time the instrument was published, C. Sechrest was not of sound mind, it might have been established by other sufficient evidence, as was held by this court in the matter of Alsey Howard's will, (5 Mon., 199;) Reed's will, (2 B. Mon., 79.)
A number of the witnesses, examined for['appellants, swore they had known C. .Sechrest long and intimately; that they had business transactions with him, some of them just before, and some very soon after, the date of the contested paper; that he, at all times when with them, understood the business he was engaged in, and did it prudently and sensibly; that he was a money lender, both before and after said period, and employed a large capital in that way; small sums he loaned at an interest of 12 per centum per annum, and large sums at 10 per centum per annum; that he never loaned unless at these rates, and always had his debts well secured; that he owned a large farm where he lived, which he managed himself, and made it profitable; that, although illiterate, he could calculate interest by his head with great accuracy, and relied more upon .his own calculations than he did upon the calculations of others made with figures; that he talked sensibly and rationally upon all business transactions, and on all other subjects upon which he conversed, and managed his farm and all his affairs with judgment and success.
*172 James Martin, a witness sworn for appellees, who had known Mr. Sechrest for 17 or 18 years, lived with him in 1856, and certainly had the means of being fully informed as to the mental capacity of the old man, says, “he then,” (referring to the time he lived with him in 1856,) “directed what to do, when to plant and when to sow; he managed his farm himself, by his hands and his hirelings; his boys did not interfere with that; he understood these things very well; he was drowsy and dull, but, when aroused, he would talk sensibly.” He never “knew him to talk or act foolish.”
On the other side the witnesses proved, from his appearance, that Mr. Sechrest, at the date, of the will, was far advanced in years. James R. Sechrest, (his nephew) proved he was about 83 years of age at the time of his death, according to the information he had received from his father. All the witnesses concur in the statement that some of the physical infirmities of old age were upon him. He had in a great degree lost his action — his hands were palsied, his sight was dimmed, and his hearing was impaired. Some of the witnesses swore that for a few years before his death, when they would meet with him, he did not recognize them, although they had been in former years well acquainted with him. Penick proved he met with the old man in 1855, or 1856 — -rather thought it was in August, 1856 — and he did not know him, and that he “had a vacant and unmeaning stare oí his eyes;” that be had a business transaction with him in 1849, but from that time until he saw him in 1855, or 1856, he had had no conversation with him. Others proved that he appeared dull and somewhat stupid, but that, when aroused, he understood the subjects of conversation; and no witness on that side proved that he acted ' foolishly, or failed to converse with sense, except Bernard Schwerman, who stated “he saw the old man in 1853 at his own house when he did not know hi.n, and he talked Mghty”■ — -and John Layle, who proved that once in his presence “Ae talked simple.'1''
To some extent, then, it must be admitted, the evidence is conflicting, as is almost always the case, where the question of capacity is involved; growing out of the different circum *173 stances under which the party, whose state is the subject of inquiry, is seen by the witnesses, and the particular standard erected by each one for himself by which to test the question.
.But after mature consideration of all the evidence on both sides, we are of opiniop that, although the mental capacity of the testator was, to some extent, impaired by old age and physical infirmities, the facts decidedly preponderate in favor of his testamentary capacity at the time of the publication of the contested paper. (McDaniel's will, 2 J. J. Mar., 331; Elliott's will, Ibid, 340; Watson vs. Watson’s heirs, 2 B. Mon., 74; Reed's will, Ibid, 79; 1 Jarman on Wills, 53, 54.)
The next and last ground relied upon to invalidate the will, is, that it was obtained by the undue influence of one or more •persons, interested in having it made as it was.
No witness proves that Mrs. Sechresthad any desire that either of the wills should be made. His three sons knew they were to have the “Germany lands,” as they were called, and were no doubt anxious to have deeds made to them for their respective parcels by their father, and perhaps may have importuned him to make the deeds, but he had resisted them with firmness, and never yielded until he was convinced by Carter upon his third visit, that it could be done -without interfering with his will in other respects. For years before, it was his fixed purpose to dispose of his property by last will and testament. Some time between 1845 and 1849, he had executed a will, which he had carefully preserved; that will was never changed or modified, until the conveyances were made for the lands to those to whom he had given them, or the larger portion of them, by the will. Carter proves expressly that, when the last will was written, no one was present but himself and the testator; that there was no interference by any one whatever; that the former will was before him at the time, and he was directed by the testator to write the last will as it was written, “noting the lands which had been conveyed,” which directions he obeyed.
We do not therefore, find, from any proof in this record, that either of said .testamentary papers were procured by any improper influence of any kind from any source whatever. Nor *174 is it shown that the disposition of the property is different in this will from the'disposition made of it in the former will, except as to the land. The provisions of the former will in relation to the other property were not remembered by Carter or Myers.
Lawful influence, such as arises from legitimate or social relations, must be allowed to prodnce their natural results even upou last wills and testaments. And there can be no presumption of its unlawful exercise merely from the fact that it may be known to have existed, and may to some extent have operated on the testator’s mind. Such influences naturally produce inequalities in testamentary dispositions; but a will is not to be condemned on that account. It is only when such influence is exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns It as a vicious element of the testamentary act.
We are of opinion that there is no sufficient evidence in this case of the existence, or ot the exercise, of an unlawful influence over the testator to procure the execution of the will; and, as we are also of opinion that he was at the time of its publication of sound and disposing mind and memory, it should be established as the true last will and testament of Charles Sechrest, deceased.
The case of Reed vs. Creel & Harrison differs essentially from the present case.
The judgment of the court below is reversed and the cause remanded, with directions to affirm the judgment of the county court of Grant county admitting the will to record.