## Meuth's Executrix v. Meuth, et al.

### (Decided March 11, 1914.)

### Appeal from Henderson Circuit Court.

1. Wills—Undue Influence.—It is in rare instances that undue influence can be established by direct evidence; its existence is usually shown by the grouping of certain facts and circumstances together.

2. Wills—Undue Influence—What Constitutes.—Influence obtained by modest persuasion and arguments addressed to the understanding, or by mere appeals to the affections, cannot be properly termed undue influence in a legal sense; but influence obtained by flattery, importunity, threats, superiority of will, mind, or character, or by what art soever the human thought, ingenuity, or cunning may employ, which would give dominion over the will of the testator to such an extent as to destroy free agency or constrain him to do against his will what he is unable to refuse, is such an influence as the law condemns as undue when exercised by any one immediately over the testamentary act, whether by direction or indirection, or obtained at one time or another.

3. Wills—Undue Influence—Testamentary Capacity.—While Gross inequality of distribution of the natural objects of the testator's bounty does not, of itself, or by itself, establish undue influence, or the want of testamentary capacity, yet in connection with other evidence of testamentary incapacity or undue influence, such inequality is competent.

4. Wills—Testamentary Capacity.—It is as necessary, in order to have testamentary capacity, for one to have such sensibilities as will enable him to know the obligations he owes to the natural objects of his bounty, as it is for him to have the capacity to know the nature and value of his estate, and a fixed purpose to dispose of it.

5. Wills—Testable Capacity—Definition of.—Testable capacity is that capacity which enables one of sufficient mind and memory to know the natural objects of his bounty and his duty to them

and to know his property, to make a rational survey of it, and to dispose of it according to a fixed purpose of his own.

S. O. HEILBRONNER, VANCE & HEILBRONNER, MONTGOM-ERY MERRITT and N. P. TAYLOR for appellant.

S. V. DIXON and G. GIVENS DIXON for appellees, Andrew J. and Sebastian M. Meuth.

DORSEY & DORSEY for appellee Charles Meuth.

CLAY & CLAY for appellees Simon Meuth, Mrs. Lizzie Long and Mrs. Susan Hancock.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal from a verdict and judgment setting aside the will of Andrew Meuth, deceased.

The testator made his will in March, 1908; he added a first codicil thereto in February, 1909, and a second codicil in April, 1911. He died in November, 1911, at the age of seventy-six.

Andrew Meuth was born in Germany, and came to America in 1853, when he was 18 years of age. His people in Germany were fairly well to do, and occasionally sent him small sums of money. He was a journeyman wagon maker; and, so far as this record shows, his first work in America was with a Mr. Hoover, in New Albany, Indiana.

Subsequently, he married Madeline Hoover, the daughter of his employer. Later he moved to Louisville, where his oldest child, Charles Hoover, was born, fifty-five years ago. Andrew Meuth did not prosper in his early years; he had a hard time getting a start in the world.

Shortly after the birth of his oldest son, Andrew Meuth went to Texas, leaving his wife and child in Louisville, apparently unprovided for. She returned to her father's home, where their second son, Simon, was born, during his father's absence.

During the war between the States, Andrew Meuth enlisted in an Indiana Regiment; and having been injured after a service of three months, he returned to New Albany and began business as a cooper.

His father-in-law, Hoover, died in 1861, and upon a division of his estate in 1864, Andrew Meuth received $550.00 as his wife's share in her father's estate.

About five years thereafter, Meuth and his family moved to Mount Vernon, Indiana, where he invested his wife's $550.00, and such other money as he could gather together, in a house which he subsequently traded for a forty acre farm.

Subsequently, he sold his property in Mount Vernon, making a profit of $1,000.00; and later, in 1876, he bought a farm of 233 acres in Henderson County from Dr. Taylor, and known as the "Home Place" in this record. He subsequently bought additional land in Henderson county, whereby he increased his Home Place to 320 acres, in addition to the McCormick farm of 167 acres on the Zion Gravel Road, about three miles from Henderson, and the Yates tract, containing 27 acres.

His first wife, Madeline, died in 1877, leaving six children, the contestants, Charles Meuth, Simon Meuth, Andrew J. Meuth, (called "Andy" in the record to distinguish him from his father, the testator), Sebastian Meuth, Mrs. Lizzie Long and Mrs. Susan Hancock.

Andrew Meuth married a second time, but his second wife died shortly thereafter, without issue. In 1883, Andrew Meuth married his third wife, Elenora Trout, of Evansville, Indiana, who survived him, and, as his widow and executrix, is the appellant in this action. By his third wife, Andrew Meuth had four children, Oscar, Joseph W., Walter and Fred J. Meuth. Oscar, however, died before his father.

Andrew Meuth left an estate worth between fifty and sixty thousand dollars. By his original will, of March 20, 1908, he disposed of his estate as follows:

1. He devised the Home Place, containing 320 acres, to his wife for life, with remainder to her four sons;

2. To his daughter, Susan Hancock, he gave 25 acres, with the improvements, to be carved out of the McCormick tract on the Zion Gravel Road, for life, with remainder to her children;

3. The remainder of the Zion Gravel Road tract of 167 acres he devised equally to his sons, Charles, Simon, Andrew, Sebastian, and his daughter, Lizize Long, children by his first wife, in fee;

4. He directed his personalty to be sold, and the proceeds divided equally between his wife and all of his children; and

5. He gave the proceeds of an insurance policy for $2,000.00, to his wife.

By the first codicil of February 27, 1909, he gave the Yates tract of 27 acres, which he had acquired since the original will was made, to his daughter, Lizzie Long; and his city property, consisting of two houses which he had likewise bought since the making of the original will, he devised to his wife, for life, with remainder to his six older children, by his first wife.

By the second codicil of April 5, 1911, he devised to his younger sons, Joseph, Walter and Fred, whatever indebtedness he held against them. He also regulated the succession of the Home Place of 320 acres, which he had given to his younger children in remainder, and the city property which he had given to his older children in remainder, by providing in each case, that if any of said children should die without issue, his or her share should go to his or her brothers and sisters of the full blood, in equal proportions, and to the descendants of such as might be dead, leaving issue.

The grounds of contest were three; (1) that Andrew Meuth, the testator, at the time he executed the will and the two codicils, did not have sufficient mind and memory to know the natural objects of his bounty, and his obligations and duty to them; (2) that he did not know the character and value of his estate, nor did he dispose of same according to a fixed purpose of his own; and (3) that the will and codicils were the result of the undue influence of the testator's wife, Elenora Meuth.

As is usual in cases of this character, the testimony has taken a wide range. We do not, however, consider it necessary to give a minute or detailed account of the testimony of the different witnesses; it is sufficient to give a general outline of the life and character of Andrew Meuth, with some special references to certain acts relied upon by the contestants in support of their claims of his incapacity, and his wife's undue influence over him. A great many witnesses, including his neighbors, the business men of Henderson, bankers and merchants, unite in saying that Andrew Meuth was not only thrifty and industrious, but was a man of fine business capacity and judgment; an excellent money maker, and not likely to be turned aside from his own judgment by the persuasion of others. The estate he accumulated is strong evidence of his business capacity.

On the other hand, the contestants show, principally by their own testimony, many instances of unfilial conduct, rough language, and mistreatment of his first wife

and her children, which it is claimed are both competent
and sufficient to establish his mental incapacity to recog-
nize his obligations to those children and his duty to
them.

We will give some of them.

On one occasion Andrew Meuth sold his son Simon
some wheat, and as Simon did not pay for it promptly,
his father sued him and collected a price which Simon
claimed was unreasonable and in excess of the contract
price. As a consequence, Simon and his father did not
speak to each other for eleven years thereafter.

On another occasion, when the testator was sick, and
his son, Andy, called to see him, the father declined
to see him.

Again, as many as five witnesses testify to a quarrel
between Andy and his father, in which the father told
his son, Oscar, to shoot Andy.

At another time, the testator said he would never be
satisfied until Andy's wife was safely buried six feet
under the earth.

In 1908, when Elenora, the step-mother, visited Andy
and his wife, the latter offered to give her step-mother
some roses; whereupon the step-mother asked that
the rose bushes be taken up for her, and this resulted in
an estrangement between the two women, and a conse-
quent ill-feeling between their husbands.

There is also testimony tending to show that the
step-mother said to some one of the family that Mrs.
Hancock had brought disgrace on the family by having
a miscarriage, and that this story was carried to the tes-
tator, and resulted in such an estrangement between him
and his daughter, that when her house subsequently
burned, her father refused to give her shelter, and she
was compelled to live in a tent for some time.

It is claimed a similar story was circulated by the
step-mother to the effect that the child of Mrs. Long, the
other daughter of the testator, came near being a bas-
tard, and that this story having come to the ears of her
father, it tended to prejudice him against her.

Mrs. Elenora Meuth denied that she ever mentioned
either fact to her husband.

On one occasion the step-mother spoke of the wife
of Charles Meuth in a disrespectful manner, saying she
was "no account," and calling her bad names.

On another occasion, the testator threw an axe at his son Charles; and on going home once in a temper, he broke all the dishes on the dinner table with his cane.

It is also pointed out that when four of the children sent floral designs for their father's funeral, their step-mother caused these cards to be removed, thereby showing her disrespect for their father, and her prejudice against the children. It appears, however, that the cards were removed by the undertaker for the purpose of enabling the family to send the acknowledgements usual in such cases.

On another occasion, during an exceedingly wet season in 1878 or 1879, Andrew Meuth became very much enraged, cursed God, and getting his gun, shot up into the clouds.

The testator's second son, Andy, was his chief assistant in running the farm, and to keep Andy at home, his father sold him 82 acres of land near the Home Place. After the quarrel between Charles and his father, Charles left home. He returned, however, and cared for the farm while his father was in Europe in 1883. Sebastian joined the regular army in early life, and is still there.

When the testator bought the Taylor farm in 1876, it was run-down, damp in many places, and in a bad condition generally. With the help of his older sons, through many years of hard work, he ditched, drained, cleared, fenced and improved the place generally, so as to greatly enhance its value.

Mrs. Elenora Meuth contradicts all these witnesses whose testimony tends to show that she poisoned the mind of her husband against his children by his first wife; and it is but fair to say that many of the alleged acts of that kind are shown, upon cross-examination, to amount to very little, or nothing.

There is, however, quite a good deal of evidence to the effect that Andrew Meuth was a high tempered, unreasonable and coarse man, much given to the use of language of a low order; and while his treatment of his older set of children was frequently quite severe, if not cruel, he never so treated his younger children by his last wife. And while he was stubborn in many ways, the older children say his last wife always succeeded in having her own way, and in getting whatever she wanted. One witness testified that shortly after the testator married his third wife, some one asked her why she had mar-

ried the testator, and that she answered, "for his money," or "because he had money."

Upon the subject of the inequality of the devises to the older children as compared with the younger, there is considerable difference of opinion between counsel, owing largely to the different values placed by them upon the respective tracts of land, disposed of by the will.

To illustrate, appellant contends the proof shows that the Home farm of 320 acres is worth only $60.00 an acre, while the Zion Gravel Road farm, of 167 acres, is worth $100.00 per acre. On the other hand, appellees insist the proof shows that each of said farms is worth $75.00 per acre. According to appellees' contention, the six older children get $3,175.00 apiece, under the will, while they will each get $4,677.00 if the will is set aside. On the other hand, appellant contends that each of the younger children gets $3,578.00 under the will, while each of the older ones gets $3,932.00, except Mrs. Long, who gets $5,594.00.

Both valuations and estimates, however, concur in the conclusion that the widow, Elenora Meuth, will, in any event, get quite a substantial proportion of the estate; and it is apparent, that under the will she and her three sons get a much larger share than the older children, except Mrs. Long.

Appellant contends, (1) that this evidence in no way shows mental incapacity upon the part of Andrew Meuth, or any undue influence exerted over him by his wife, or by any one, and that the court should have directed the jury to find for the propounders; and, (2) that if the case should have been submitted to the jury, the second instruction upon the subject of testamentary capacity was radically wrong.

It is in rare instances that undue influence can be established by direct evidence. Its existence is usually shown by the grouping of certain facts and circumstances together: Rhea v. Madison, 151 Ky., 263.

In Wise v. Foote, 81 Ky., 15, the court undertook to define undue influence, as follows:

"Influence obtained by modest persuasion and arguments addressed to the understanding, or by mere appeals to the affections, cannot be properly termed undue influence in a legal sense; but influence obtained by flattery, importunity, threats, superiority of will, mind, or character, or by what art soever that human thought, in-

genuity, or cunning may employ, which would give dominion over the will of the testator to such an extent as to destroy free agency, or constrain him to do against his will what he is unable to refuse, is such an influence as the law condemns as undue when exercised by any one immediately over the testamentary act, whether by direction or indirection, or obtained at one time or another.''

This language was quoted with approval in Sherley, v. Sherley's Exr., 81 Ky., 246.

In Lischy v. Schrader, 104 Ky., 657, we said:

''The undue influence contemplated by law is often exceedingly difficult to establish by proof. It, of necessity, depends largely upon circumstantial evidence.''

In Fry v. Jones, 95 Ky., 149, we said:

''It may be said of the testimony that it sufficiently establishes the mental ability of the testator to make the will, and unless the proof discloses a state of fact from which the jury could legitimately infer the existence and the exercise of an improper influence over him, the verdict must be set aside. It must be admitted that the rules by which may be ascertained the existence of a mental force or power so subtle and intangible as that denominated as 'influence,' or 'undue influence,' are not clearly defined or perhaps definable. Certainly no general rule may be laid down by which this obnoxious force may be detected. We can easily say that the force must be such as to control the mental operations of the testator, and amount to a substitution of the will of the dominant over the weaker mind. But this is merely a statement of the effects of the inhibited influence. The question is how shall we detect its presence? Manifestly this may best be done by that tribunal to which is afforded the opportunity of meeting the witnesses face to face and hearing them testify in any given case. Before such the general bearing and conduct of all the witnesses, and especially the mental characteristics of those who are charged with having controlled another become matters of personal observation and oversight. To a jury of the vicinage, therefore, must be left in a large measure the detection of this refined and subtle, though reprehensible, power. They may not determine its presence without evidence of it, but we may well hesitate to determine the absence of such evidence when in their wisdom it is found to be present.''

In Zimlich v. Zimlich, 90 Ky., 657, this court, in speaking of the effect of an inequality of distribution, said:

"While gross inequality of distribution between the natural objects of the testator's bounty does not, of itself, or by itself, establish undue influence, or the want of testamentary capacity, yet in connection with other evidence of testamentary incapacity or undue influence, such inequality is competent."

And, in Bottom v. Bottom, 32 Ky., L. R., 497, 106 S. W., 216, in speaking upon the subject of inequality of devise, we said:

"It is a fact that is competent to go to the jury to be considered by them in connection with other evidence offered, but it should not be especially called to their attention any more than any other evidence."

We think there was ample testimony upon the subject of undue influence to submit that question to the jury; and, if the second instruction gave the proper rule upon the question of mental capacity, that question also was properly submitted.

The second instruction reads as follows:

"The court further instructs you that if you shall believe from the evidence that at the time or times of executing the said paper or papers in contest the said Andrew Meuth was then laboring under such defect of mind and memory or reason that he did not then know the natural objects of his bounty *and his duty to them,* or the character and value of his estate, and was not then able to make a rational survey of it, and dispose of the same according to a fixed purpose of his own, then said deceased did not have mental capacity sufficient to make a will and you should so find."

Appellant contends that the words "and his duty to them," were improperly embraced in the instruction, and gave an erroneous rule by which the jury should measure the testator's capacity to make a will.

Tudor v. Tudor, 17 B. M., 391, has been referred to in later cases as a pioneer case in defining the proper rule as to what constitutes soundness of mind in a testator. In that case the instruction said: "Soundness of mind in making a will, is the capacity to know his children and his estate, and to dispose of the same in a rational manner, in accordance to a fixed purpose of the testator."

In the later case the phrase "to take a rational survey of his estate," was substituted for the earlier phrase "to dispose of the same in a rational manner."

In Wise v. Foote, 81 Ky., 10, this court seems to have first used the words, "and his duty to them," by way of enlarging the rule and as evidence of mental capacity. In that case, it is said:

"Testable capacity does not rise to that high degree of understanding and ability necessary to render a person capable of making a contract where the parties deal at arm's length, but exists where the testator has mind and memory enough to understand that he is selecting the persons whom he wishes to have his property, and to know his property, and the natural objects of his bounty, and his duties to them and the persons upon whom his property is bestowed by the testamentary paper which he signs."

In Sherley v. Sherley's Exr., 81 Ky., 249, the court referred approvingly to the language used in Tudor v. Tudor, *supra,* upon the subject of testable capacity; and as it expressly said the testator must have the capacity "to comprehend or understand all or any of the essential elements of testable capacity which were approved in Tudor v. Tudor," it is insisted the court intended to disregard the rule announced in Wise v. Foote, upon this subject, and to return to the original rule laid down in Tudor v. Tudor.

However, the question again arose in the late case of McDonald's Exrs. v. McDonald, 120 Ky., 217, where this court said:

"There was much testimony offered by the contestants tending to show that the testator did not know the obligations he owed to his children. He unquestionably had the mind to know his estate, and the nature and value of it. He seems to have had a fixed purpose as to the disposition of his estate, and that purpose was to give his children as little interest in it as possible. The contest was waged upon the ground that his aversion to his children was such that he did not know the obligations he was under to them. It is as necessary in order to have testamentary capacity, for one to have such sensibilities as will enable him to know the obligations he owes to the natural objects of his bounty, as it is for him to have the capacity to know the nature and value of his estate, and a fixed purpose to dispose of it. (Murphy's Exr. v. Murphy, 65 S. W., 165; 23 Ky., Law Rep., 1460; Wise

v. Foote, 81 Ky., 10; 4 Ky. Law Rep., 643; Woodford v. Buckner, 111 Ky., 241, 63 S. W., 617; 23 Ky. Law Rep., 627.) We are of the opinion that there was abundant evidence tending to show a lack of testamentary capacity to justify the court in submitting the case to the jury.''

In the later case of Rasdall v. Brush, 31 Ky., L. R., 1138; 104 S. W., 749, where the will., as here, was contested upon the grounds, that the testator did not have sufficient mind or mental capacity to make the will and codicil, and that their execution was procured by undue influence of his wife, the principal devisee, the instructions followed the older forms, omitting the idea set forth in the McDonald case, above cited. In reversing the case for that error, the court said:

''This court has, in early opinions, approved instructions, in effect similar to those given by the court in this case; but has in more recent cases settled the definition of mental capacity to be that capacity which enables one of sufficient mind and memory to know the natural objects of his bounty and his duty to them and to know his property, to make a rational survey of it and to dispose of it according to a fixed purpose of his own. (McDonald's Exrs., &c. v. McDonald, 27 Ky. L. Rep., 607; Woodford v. Buckner, 23 Ky. Law Rep., 627; Lancaster v. Lancaster's Exr., 27 Ky. Law Rep., 1127; Wise, &c. v. Foote, 4 Ky. Law Rep., 643; 81 Ky., 10; Murphy's Exr. v. Murphy, &c., 23 Ky. Law Rep., 1460; Walls v. Walls, &c., 30 Ky. Law Rep., 948, and Bradshaw v. Butler, 30 Ky. Law Rep., 1249.) In the case of Wise v. Foote, *supra,* in speaking of testamentary capacity, the court said:

'' 'Testable capacity does not rise to that high degree of understanding and ability necessary to render a person capable of making a contract where the parties deal at arm's length but exists where the testator has mind and memory enough to understand that he is selecting the persons whom he wishes to have his property, and to know his property, and the natural objects of his bounty, and his duty to them and the persons upon whom the property is bestowed by the testamentary paper he signs.'

''Instructions which do not recognize that a testator has natural objects of his bounty and owes them a duty, disregards not only the principal laid down by this court as to what constitutes testamentary capacity, but disregards paternal instinct.''

The rule thus announced after a careful review of the authorities, was followed in instruction No. 2, given in this case. And under that rule, the evidence justified the submission of the case to the jury.

The rule announced in McDonald v. McDonald, and reiterated in Rasdall v. Brush, *supra,* was evidently adopted after full consideration, and we do not feel inclined to depart from it.

The instructions being unobjectionable, it was for the jury to pass upon the weight to be given the evidence.

Perceiving no error in the record, the judgment is affirmed.