### Robinson, et al. v. Davenport, Executor, et al.

(Decided March 5, 1918.)

#### Appeal from Warren Circuit Court.

1. Wills—Contest—Rules Governing.—The trial of a will contest is governed by the same rules of practice as the trial of other issues, and if the evidence upon the mental capacity of the

testator, as well as undue influence exercised upon him, is conflicting, the verdict of a properly instructed jury will not be set aside unless the verdict is flagrantly against the evidence.

2. Wills—Mental Capacity.—The fact that the testatrix was 88 years old and crippled, rendering her practically helpless physically, may both be considered by the jury in passing upon her mental qualifications to execute a will, but those facts alone are insufficient to authorize a finding that the testatrix was mentally incapable. to execute her will where the evidence of witnesses standing in a position to know is to the effect that her mind was clear and that she understandingly executed her will, possessing the mental qualifications required by the law.

3. Wills—Undue Influence.—To show undue influence sufficient to invalidate a will there must be not only an opportunity to exercise such influence or a possibility that it was exercised, but there must be some fact or circumstance at least tending to show that it was actually exercised.

W. B. GAINES and SIMS, RODES & SIMS for appellants.

BRADBURN & BASHAM for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellants are contestants of the will of Miss Columbia Buckner, a maiden lady who died in February, 1915, at the age of nearly 93 years. The will was executed on February 28, 1911, when the decedent was `88 years of age. The contestants are collateral relatives of the decedent, the nearest relationship of any of them being a nephew.

The usual grounds of such a contest, that of mental incapacity and undue influence, are urged as causes for rejecting the will. Upon a trial of the contest in the county court the will was probated, and from that order and judgment the contestants prosecuted an appeal to the circuit court, in the trial of which a similar verdict was returned by the jury empaneled to try the case, and from the judgment rendered on that verdict probating the will and dismissing the contest this appeal is prosecuted.

By her will the testatrix devised her farm in Warren county, consisting of about two hundred acres, her one-half interest in the household and kitchen furniture, and some live stock to Miss Ella Myrtle Tarrants, a young lady who had lived with, looked after and cared for the decedent and performed household duties for a period of seventeen or eighteen years. To her sister-in-law, Mrs.

Lizzie Buckner, she devised $500.00; to a little boy who lived in the house, $25.00, and to her relatives and a number of her friends she devised various articles of personal property in the nature of heirlooms or which were otherwise specially valued by the testatrix.

A condensed statement of the facts, sufficient however to understand the issues, is that the decedent owned about two hundred acres of land in Warren county, located on Barren river about three miles from the city of Bowling Green. As much as or more than fifty years ago her father, Major Archibald Buckner, deeded the farm to his daughter, the decedent, by an absolute deed. After the death of her parents the decedent continued to live upon the place, and it seems that her brother, Jim Buckner, lived with her, as did his wife, Mrs. Lizzie Buckner. About the year 1893 the brother died, but his widow continued to live with the decedent upon the farm. In 1906 John Robinson, who was the husband of decedent's sister, died, and the sister moved upon the place and lived there until her death some five or six years thereafter.

For about eighteen years before the death of the decedent the principal devisee and contestee, Miss Ella Myrtle Tarrants, who was then a poor girl 16 years of age, went to the home of the decedent as a servant girl under a contract by which she was to do the general household duties, including cooking, washing, milking, &c., for her board and four dollars per month. She faithfully did that work upon those terms for more than fifteen years, when, according to the testimony, she began to do outside work such as attending to the garden, and perhaps work of other character, when her wages were increased from four to five dollars per month, which she received until the decedent's death. A year or two after Miss Tarrants went to the place under the terms specified, the decedent sustained a fall of some character in which she received an injury to her back which forever disabled her from walking or otherwise getting about unassisted, and from that time on she occupied a rolling chair. When it would be necessary for her to go to her meals Miss Tarrants would have to lift and support her to and from the table. For a number of years before her death, on account of her physical afflictions, she became more troublesome, and duties arose in looking after her similar to those necessary to bestow upon helpless children. These, according to the testimony, were practically

all performed cheerfully and without grumbling by Miss Tarrants. For many years during the helpless condition of the decedent in appropriate seasons of the year she would attend church in the neighborhood, which would require her to be lifted into the vehicle which would be driven to a window near the preacher and from which the sermon could be heard. On these occasions the faithful Ella would be along, ready to administer to the decedent's every want and requirement. A great affection grew up between the two, according to the testimony, akin to if not fully as strong as that existing between mother and daughter. The contestants, during the physically helpless condition of the decedent, rarely visited her, and when they did so their visits would be short as though the task were irksome. On the morning of the day upon which the will was executed, the decedent sent word by Miss Tarrants to one of her neighbors, a Mr. Davenport, for the latter to come over to her house. The request was obeyed, and when Mr. Davenport arrived he was informed by the decedent that she desired to execute her will and she wanted him to procure Judge Bradburn, of Bowling Green, to write it and a Mr. Ennis and a Mr. Savage to witness it, but instructed him that before he went to town to procure those persons for him to send Mrs. Davenport over there. Within a reasonable time she arrived, and the decedent told her how she wanted her will written, and requested Mrs. Davenport to make a pencil outline of her wishes. This was done, but two or three efforts were made by Mrs. Davenport before she got the pencil notations as the decedent wanted them. Some time in the early afternoon the attorney and the witnesses arrived, and the will was duly prepared and executed, the attorney being furnished with the pencil notes as outlined for the draft of the will, and after its execution it was delivered to him with the instruction to keep it in his office until the decedent's death or until she called for it. A little more than three years thereafter she died without having called for it and it was subsequently probated, as stated.

Upon the trial eight witnesses, including appellants, testified in their behalf upon the issue of the testatrix's mental capacity, while nine witnesses, including Miss Tarrants, testified for appellees upon the same subject. The eight witnesses mentioned introduced by contestants upon that point gave it as their opinion that the testatrix

did not have according to the required legal standard, sufficient mental capacity to execute a will, but many of them had not seen her for as much or more than a year from the date of the execution of the will, and then only casually, and all of them gave as reasons for their opinion that the testatrix had ceased to take the interest in conversations which she once did and that sometimes she would not at first recognize people whom she had long known, and was sometimes forgetful. No prominent fact is brought out by any of them showing any material impairment of the mind of the testatrix. Two disinterested witnesses testify that on the day of the burial one of the strongest witnesses for the contestants made the statement that if any one said that the deceased was not a person of good mind that she (witness) would shake her fist in their face and deny it. With the exception of Miss Tarrants, the witnesses for contestees (who are Miss Tarrants and the executor) are not interested in the result of the contest. They are neighbors and long standing acquaintances of the testatrix and most of them saw her frequently, some of whom had transactions with her as late as the year before the execution of the will. In 1908, and also in 1910, the decedent sold portions of her land, and the vendees, as well as Mr. Webb Wright, an attorney of high standing at Bowling Green, testify concerning the condition of her mind at those times, the substance of which is that it was as clear as they had ever known it. The lawyer who wrote the will and the attesting witnesses are also quite positive that the testatrix fully comprehended and thoroughly understood what she was doing at the time the will was executed. Everybody concedes that the decedent was an unusually bright woman, and possessed of positive convictions and considerable self-determination. In addition, she was kind, affectionate and appreciative, and lost no opportunity to show gratitude for kindnesses and favors done.

Some twelve or more years before the execution of the will in contest she executed another, which is now destroyed, but in which, according to the testimony, she devised her farm to Miss Tarrants and her then living sister, Mrs. Robinson, in equal shares, all of it to go to Miss Tarrants after the death of her sister. The latter was dead when the will in contest was executed, and there was no longer any occasion for provisions to be made for her.

In the last will is this significant statement: "The above bequest to Miss Ella Myrtle Tarrants of my land and personal property named is in consideration of her care and attention to me in sickness, and in fact for her constant labor, care and attention to me for about seventeen years, during all of which time she has been to me my only support and comfort in my old age and affliction, and because I want her to have it."

Upon the issue of undue influence there is a total want of testimony, unless it might be said that the fact that Miss Tarrants went after Mrs. Davenport on the morning of the day the will was executed is a circumstance showing activity on her part and a possibility of her having influenced the testatrix in her determination to execute the will.

In the brief of counsel for contestants we are not pointed to any fact furnished by the record, aside from the general statements of appellants' witnesses as to their opinion, showing a want of mental capacity on the part of the testatrix except the fact of her age and physical infirmity. But neither of these in law, standing alone, is sufficient to destroy one's capacity to execute a will. The question is always one to be inquired into, like any other fact, and to be ascertained from all the testimony and circumstances surrounding the transaction. In the early case of In re Higdon's Will, 6 J. J. Marshall 444, the testatrix was 85 years old. The facts in that case upon the matter of the age of the testatrix, her physical condition, as well as circumstances under which she executed the will, bear a great similarity to those of like character in the instant case. This court by Judge Robertson, in reversing the judgment of the trial court setting aside the will, in the opinion said: "It is true that she was about 85 years old; and that all of her faculties were perceptibly decayed, and her memory, especially, very much impaired. But her mind was only somewhat torpid, not unsound; the occasional languor and absence, and even apparent imbecility of her mind, were only the natural and ordinary consequences of her old age, and were, in kind and degree, only such as may be expected to mark such extreme longevity as 85 years old. Only benumbed with years, her mind was always rational, and when it acted, was consistent and intelligent. She seemed to be well acquainted with her property and

its value, and generally superintended the management of her own affairs.''

There seems to have been much more convincing evidence of mental impairment in that case than is found in this record. As in that case so in this the testatrix was ''well acquainted with her property and its value, and generally superintended the management of her own affairs.'' A similar question was involved in the cases of Ligon v. Osborn, 155 Ky. 328; Watson v. Watson's Heirs, 2 B. Mon. 74, and Sechrest v. Edwards, 4 Met. 163. In the latter case, after rehearsing the evidence, the court sums up its conclusions thus:

''But after mature consideration of all the evidence on both sides, we are of the opinion that, although the mental capacity of the testator was, to some extent, impaired by old age and physical infirmities, the facts decidedly preponderate in favor of his testamentary capacity at the time of the publication of the contested paper.' (McDaniel's Will, 2 J. J. Mar. 331; Elliott's Will, Ib. 340; Watson v. Watson's Heirs, 2 B. Mon. 74; Reed's Will, Ib. 79; 1 Jarman on Wills, 53, 54).''

The proper rule for measuring the necessary mental capacity sufficient to enable the testator to execute a will, as has been many times declared by this court, is that he should have sufficient mental capacity to take a survey of his property, to know its value, to know the objects of his bounty and his duty to them, and to dispose of his property according to a fixed purpose of his own. Wise v. Foote, 81 Ky. 10; Phillips v. Phillips, idem, 332; McDonald v. McDonald, 27 Ky. L. R. 609; Meuth v. Meuth, 157 Ky. 793, and many other cases which might be cited. The same and other cases define undue influence to be an influence obtained over the mind of the testator to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, or exerted directly or indirectly, provided it so operated upon his mind at the time of the execution of the will; but any reasonable influence obtained by acts of kindness or by appeals to the feeling or understanding and not destroying free agency is not undue influence. See authorities, supra, and Hobson on Instructions, section 629, and notes.

The instructions in this case, and of which no complaint is made, fully cover the above definitions, and, ac-

cording to our view, the testimony was amply sufficient to support the verdict of the jury in finding that the testatrix possessed sufficient mental capacity to execute the will in contest, and that it was executed free from undue influence as the law defines that term.

We can not afford to indulge in speculation, as counsel for appellants would have us do, concerning the probable reasons why the will was executed as it was, or why it was executed at all.

To show undue influence sufficient to invalidate a will there must be not only an opportunity to exercise such influence, or a possibility that it was exercised, but the testimony must go further and show facts or circumstances from which the jury would be authorized to infer that it was actually exercised. Brent v. Fleming, 165 Ky. 356.

It is insisted that the testatrix, with the known regard which she had for her relatives as well as her pride in her family name, would have thereby been induced to give them not only more of her property, but especially would she have been disposed to entrust to their keeping her prized heirlooms, but we can not inquire into her mind for a reason for her failure to do the latter, if she did, but must look only to the record. From it we see that she did devise a number of apparent keepsakes to her different relatives, and if she possessed other articles of a similar nature the record does not show it. It is sufficient for us to say that there is abundant testimony to sustain the verdict of the jury upon both of the propositions submitted to them, and we can not see that the verdict is even against the preponderance of the testimony, much less not sustained by it.

It therefore results that the judgment must be and it is affirmed. Whole court sitting.