## Newman v. Dixon Bank and Trust Company, Exor., et al.

(Decided October 14, 1924.)

### Appeal from Henderson Circuit Court.

1. Wills—Evidence of Mental Incapacity Held Not Sufficient to Take Case to Jury.—In will contest, evidence of mental incapacity held insufficient to take case to jury.

2. Wills—Test in Determining "Testamentary Capacity."—Test in determining whether testator had "testamentary capacity" is, did he have sufficient mental capacity to take survey of property, know its value, natural objects of his bounty, and his duty to them, and to dispose of his property according to fixed purpose of his own?

3. Trial—"Evidence" Within Rule Requiring Questions of Fact to be Submitted to Jury.—"Evidence," within rule requiring questions of fact to be submitted to jury, if supported by scintilla of evidence, is something of substance, and not mere vague, uncertain, or irrelevant matter, not carrying quality of proof or having fitness to induce conviction.

4. Evidence—Where Facts Insufficient to Show Mental Incapacity, Opinions Based Thereon are Likewise Insufficient.—Where facts

relied on are insufficient to show mental incapacity, opinions of witnesses based thereon are likewise insufficient for that purpose.

5.  Wills—Facts Held Not to Show Testamentary Incapacity.—That testator was man of high prejudice, believed and argued that negro was brute and had no soul, that Catholic church would destroy government, and that all poolers of tobacco should receive same price, and, though general practitioner, rejected germ theory of disease, and resorted to osteopathy during last year or two of his life, did not show testamentary incapacity.

6.  Wills—That Testator Thought Children had Died Childless, Leaving Him Heir, was Not Evidence of Testamentary Incapacity.—That testator when he made his will thought that his children, dying childless, had left him as sole heir, when in fact they had devised their property to a brother, was not evidence of testamentary incapacity.

7.  Wills—That Executors Resorted to Suit for Construction of Will no Evidence of Testamentary Incapacity.—That executors resorted to suit for construction of. will is no evidence whatever of testamentary incapacity. unless will on its face is so irrational as to indicate that it was not product of sound mind.

8.  Wills—Condicil that Debtor should Not be Forced by Suit to Pay Note no. Evidence of Testamentary Incapacity.—A codicil providing that maker of notes, so long as he kept them alive and did not permit them to become barred by limitations, should not be forced to pay by suit was no evidence of testamentary incapacity.

YEAMAN & YEAMAN and BOURLAND & BLACKWELL for appellant.

DORSEY & DORSEY and RAYBURN & WITHERS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Dr. V. B. Newman, a resident of Henderson county, died on December 7, 1919, and left a will by which he devised his property to certain relatives, friends and charities.   The will was dated October 17, 1917, and at that time he was nearly eighty years of age.   Subsequently, he made two codicils, one dated October 2, 1919, and the other October 4, 1919.   The will was probated in the Henderson county court, and on appeal in the Henderson circuit court, the will was contested by Elliott L. Newman, the only child of the testator, on the ground of mental incapacity.   Pursuant to a peremptory instruction, the jury returned a verdict sustaining the will. Judgment was entered accordingly, and Elliott L. Newman has appealed.

The only question for decision is, whether the evidence of mental incapacity was sufficient to take the case to the jury.

The record discloses that for many years prior to his death V. B. Newman was a regular practicing physician of Webster county. In the year 1885 he became angry at his wife and ordered her and their three children to leave home. They were put in a wagon with some articles of clothing, and driven to a neighbor's. About the same time, he conveyed a farm in Union county, containing about 110 acres of land, to his wife for life, remainder to their children in fee. Several years later, two of the children died leaving wills by which they devised their interest in the property to Elliott Newman. After their departure the only communication he had with his wife or children was to send to his daughter a dress, and to each of the boys $10.00 apiece, and to write appellant a letter saying that he wanted to see appellant, but appellant neither answered the letter nor called to see him. The testator was a vigorous minded, energetic man, and acquired what might be called a large estate for the locality in which he lived. He was a man of high temper, strong prejudices and inclined to debate. One of his contentions was that the negro was a brute and had no soul, and that the Catholics would destroy the republic and each of their churches was an arsenal equipped for that purpose. He also rejected the germ theory of disease, and was known to argue that each pooler should receive the same price for his tobacco. According to Dr. Winstead, the testator was an extremist on any subject, and was not a well balanced man. After calling attention to the testator's views on the negro and the Catholic churches, he gave it as his opinion that a man who is as easily influenced by prejudice as the testator was would not be capable of disposing of his estate. However, on cross-examination he said that he had a land deal with the testator; that the testator knew its value, and how to dispose of it. He also added that he believed the testator had sufficient mental capacity to make a survey of his property, and know its value, and the objects of his bounty and his natural obligations to them. He further said: "There is just this about it, if there was no prejudice no way he was all right, but if he was a little mad at any of his—those who had claims on him—I think he would go any limit rather than to yield." He concluded his testimony with the statement that, regardless of his prejudice, he believed the testator would know how he was disposing of his estate.

The appellant testified to the circumstances under which his mother and the children left the home of his father. He knew nothing about his father's mental capacity. At the time he testified he was 42 years of age, and had never visited his father.

Sam Campbell knew the testator thirty or forty years. The testator bought a piece of land from him. He called attention to the testator's views on the negro and the Catholic church, and gave it as his opinion that the testator was not possessed of testamentary capacity. On cross-examination he stated that the doctor was a rather sharp man, and would not say that he was particularly broad. He regarded the doctor's mental capacity as limited because he made most of his money by his profession, and a year or so before he died went off on a hobby and said that medicine was a humbug. He then went to rubbing people on the back, "making their backs pop," and said that it would do them more good than all the medicine.

Ben Watson had known Dr. Newman all his life. The doctor had a good deal of book learning, and believed that a man ought to go to school. The doctor was a high-tempered man and very prejudiced in some things. He was always talking about the negro or the Catholic church. On being asked if Dr. Newman knew the location and value of his property, his natural duty to his children, or those who had claims on his bounty, and how to dispose of his property according to a fixed purpose of his own, the witness said: "Well, Dr. Newman I always regarded as a man of good sense, but he was a man of very high prejudice, and it might have been that if he had a little prejudice against you he might not have done what he conceived to be right."

G. M. Eubank had known the doctor for many years, and the doctor had saved his life. The doctor on one occasion had said that his only objection to the tobacco pool was that they didn't grade every man's tobacco at the same price. The doctor would also maintain that the negro was a beast and had no soul. In his arguments the doctor would not pay any attention to him, but would go on with his argument.

J. L. Harris, a brother-in-law of the testator, testified that he paid his sister $720.00 which came from his mother's estate; that the doctor said he was going to put it into Union county land. The witness further stated that he had shot Dr. Newman and tried to kill him, yet

he had a feeling for him and was glad it went off like it did. He felt the doctor was not responsible for what he did or what he said.

Judge Flournoy had known Dr. Newman ever since he came to Union county, and in answer to the question as to whether the doctor had testamentary capacity the witness said: "If his antipathies were aroused, or he became irritated by any proposition at all, I would say absolutely no. I never regarded him as balanced."

Dr. C. M. Smith had known testator for about thirty years. "He was a man with a highly nervous system and extreme prejudices." "He was a man of a good deal of book- learning and had a wonderful memory." "He would go crazy on certain things—greenbackism and religious matters—and was very strong in his arguments, much more than anybody else." On hearing the doctor argue about the negro and Catholicism the doctor would give "just notions of his own; more like a man suffering from a delusion." In answer to the question if he believed the doctor could make an intelligent disposition of his property and know the objects of his bounty, he replied: "I think he would be swayed by his emotions." He reckoned the doctor was a fairly good business man, but met the doctor in consultation often, and the doctor would argue that there was no such thing as a typhoid germ, and added, "It looks to me if a man didn't have mind enough to believe what was taught I wouldn't regard him as being a man of normal mind." In closing his testimony he said that he supposed Dr. Newman accumulated what property he had by his own labor, that the doctor knew how to make trades and contracts, and to conduct his farm and other business; that he supposed he knew how to make a sale and purchase as well as the average man. He also supposed the doctor knew the value of his horses and land, the terms of his contracts and obligations, and was at all times able, until his death, to look after his estate and to say what it was worth, and what it consisted of. He also added that he would have had no hesitancy, in 1917 or 1918, in entering into business arrangements with the doctor. The witness also added that many insane persons made good trades.

As before stated, lack of testamentary capacity was the sole ground of contest. The test is, did the testator have sufficient mental capacity to take a survey of his property, know its value, the natural objects of his bounty and his duty to them, and to dispose of his property ac-

cording to a fixed purpose of his own. Robinson v. Davenport, 179 Ky. 598, 201 S. W. 28. "Evidence," within the meaning of the rule requiring questions of fact to be submitted to the jury, if supported by a scintilla of evidence, is something of substance, and not mere vague, uncertain, or irrelevant matter, not carrying the quality of proof, or having fitness to induce conviction. Clark, et al. v. Young's Admrx., 146 Ky. 377, 142 S. W. 1032; Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134. It is also the rule that where the facts relied on are insufficient to show mental incapacity, the opinions of the witnesses based thereon are likewise insufficient for that purpose. Schrodt's Exor. v. Schrodt, 181 Ky. 174, 203 S. W. 1051. The facts relied on to show mental incapacity are: The testator was a man of high prejudices; he believed and argued that the negro was a brute and had no soul; that the Catholic church would destroy the government, and that all poolers of tobacco should receive the same price for their tobacco; he rejected the germ theory of disease, and though a general practitioner, resorted to osteopathy during the last year or two of his life. There are few men whose opinions are altogether sound according to the modern standard, and we have not reached the point where the fact that one's view on racial, religious, economic or medical questions, having nothing to do with the disposition of his property, may be regarded as evidence of testamentary incapacity. Unfortunately, racial and religious prejudices still persist, in spite of the command to love one another, and many who claim to be followers of the Master do not seem to realize that they are the easy victims of those who foster and capitalize that prejudice for their own aggrandizement. So long, therefore, as the natural objects of one's bounty are not members of the race, or sect, against which the prejudice is directed, it can not be said that the mere existence of the prejudice in the abstract renders him incapable of disposing of his property. A different case would be presented if the physicians had given an unqualified opinion that the testator was of unsound mind. Though they testified that he was not of normal mind because of the peculiarity of his views, yet they admitted that the testator was a good business man, knew what property he had, understood how to make trades, and enter into contracts. Indeed, they practically admitted that the testator had sufficient mind and memory to enable him to understand and do everything necessary in the making of a valid will,

and thus neutralized the effect of their opinions, which were based entirely on circumstances having no connection with the making of the will.

But it is insisted that certain provisions of the will afford some evidence of mental incapacity. By one of these provisions he recited that his two children, Adella and Joseph Newman, who owned an undivided interest in the Union county land, had died childless, leaving him as their only heir, and then devised the interest thus acquired to Elliott Newman for life, remainder to his bodily heirs, but provided if he left no bodily heirs, it should be sold and the proceeds distributed according to clause 7 of this will. As a matter of fact, however, Adella and Joseph Newman left wills by which they devised their interest in the Union county land to Elliott Newman, and it is argued that the testator did not know his estate because he attempted to devise property in which he had no interest. There is nothing in the record to show that the testator knew that Adella and Joseph Newman had left wills devising their property to their brother Elliott, and, in the absence of such knowledge, it was but natural for him to assume, from the fact that they died childless, that he, their father, was their only heir, and to act on that assumption, and the fact that he did so, can not be regarded as evidence of testamentary incapacity.

The other provision relied on to show want of testamentary capacity is codicil No. 1, which is as follows:

"I have this day sold and conveyed to F. B. Berry a certain tract of land in Henderson county, Kentucky, and have taken his notes aggregating the sum of six thousand dollars; it is my will so long as he keeps said notes alive and does not permit them to become barred by the statute of limitation now in effect or which may hereafter be in effect, he shall not be forced by suit to pay same. This October 2, 1919."

The argument is that the provision was so vague and indefinite as to require a suit for its construction. Whenever the language of a will is uncertain the executors naturally prefer to have the will construed and their powers clearly defined, to the end that they may be protected in whatever they may do by the judgment of the court, and the fact that they resorted to a suit for the construction of the will is no evidence whatever of testamentary incapacity unless the will on its face is so irra-

tional as to indicate that it was not the product of a sound mind. In view of the pending suit for the construction of the codicil we need go no further than to say that it indicates a spirit of indulgence on the part of the testator, and can not be regarded as in the least irrational. Indeed, an examination of the will will show that it contains many devises and bequests, with numerous conditions and limitations, and that in clearness and succinctness it compares very favorably with the average will prepared by members of the legal profession.

After. all, the case, as made out by the contestant, was simply one where the testator, who was a man of strong will and fine intellect, was shown to have entertained high prejudices and peculiar views on subjects not connected with the disposition of his property, and the evidence was so lacking in probative effect as not to require the issue of testamentary capacity to be submitted to the jury.

Judgment affirmed.