### Broyles, et al. v. Able, Jr., Administrator, etc.

(Decided February 10, 1925.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, First Division).

1. Wills—Test of Testamentary Capacity Stated.—Test of testamentary capacity is whether testator, at time of executing will, had such mental capacity as enabled him to know natural objects of his bounty, his obligations to them, and character and value of his estate, and to dispose of it according to fixed purpose of his own.

2. Trial—Substantial Evidence Necessary to Require Submission of Question to Jury.—Evidence, within rule requiring submission of fact questions to jury, if supported by scintilla of evidence, is something of substance.

3. Evidence—Witnesses' Opinions, Based on Facts Insufficient to Show Mental Incapacity, also Insufficient.—Where facts relied on are insufficient to show mental incapacity, witnesses' opinions based thereon are likewise insufficient.

4. Wills—Evidence of Testamentary Incapacity Held Insufficient to Take Case to Jury.—Evidence of testamentary incapacity held insufficient to take case to jury; effect of uncertain opinion of physician being neutralized by his admission on cross-examination that testator had sufficient mind and memory to understand and do everything necessary in making of valid will.

5. Wills—Evidence of Undue Influence Held Insufficient for Jury.— That executor was friend of residuary devisee's father, and displayed much interest in execution of will and preparation of deed to such devisee by testator just before his death, held insufficient to take to jury question of undue influence, in absence of evidence that he exercised any dominion over testator, or suggested how will should be written.

HENRY M. JOHNSON and MORTON K. YONTS for appellants.

R. FRANK PEAK and EDWARDS. OGDEN & PEAK for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

At the time of his death, August 27, 1921, J. W. Broyles was 83 years of age. His only heirs were his niece, Mary Broyles, who was the only daughter of Mary Elizabeth Evans, the deceased's sister, and two great-nephews, Edmund Wheeler and Jasper Wheeler, and one great-niece, Ella Virginia Wheeler, the only children of Nannie Wheeler, a deceased daughter of Mary Elizabeth Evans. The material portions of his will, which was pro-bated in the Jefferson county court, are as follows:

"1st. I direct that all of my just debts and funeral expenses be paid out of my estate as soon after my death as is convenient.

"2nd. I give to Nick Stonestreet my double-barrel breech-loading shotgun.

"I have neither father, mother, brother nor sister living. I have one niece, Mary Broyles; 2 grand-nephews, Jasper Wheeler and Edmund Wheeler, and one grand-niece, Ella Wheeler. I give to my said niece Mary Broyles and my grand-nephews Jasper Wheeler and Edmund Wheeler and my grand-niece, Ella Wheeler, five dollars each and no more. I give them no more of my estate because I do not think that they have treated me with that respect and consideration that was due me. All of the balance of my estate, real, personal and mixed, I will and devise to Alice Muriel Barbour. The personal estate to be hers absolutely to do with as she pleases, but should said Alice Muriel Barbour die without living bodily issue, then the real estate possessed by me at the time of my death shall go to her mother, Maud Barbour, for and during the life of said Maud Barbour with remainder in fee simple to her daughter, Elizabeth Barbour, but should Alice Muriel Barbour marry and have child or children the real estate at her death shall go to her children in fee simple.

"4th. I hereby appoint and constitute W. H. Able, Jr., the executor of this my will.

"In testimony whereof, witness my hand and seal, this 13th day of July, 1920."

The will was contested by Mary Broyles, Edmund and Jasper Wheeler and Ella Virginia Wheeler, and at the conclusion of their evidence the court directed the

jury to return a verdict sustaining the will. The contestants have appealed.

On the trial, the propounders proved the residence and death of the testator by the executor, Mr. Able, and the due execution of the will by the attesting witnesses. It was further shown that the testator, in the company of Mr. Able, who was made his executor, came to the office of Judge Frank Peak, a member of the firm of Edwards, Ogden & Peak, and that the testator stated to Judge Peak what disposition he desired to make of his property, and Judge Peak in turn dictated the will to Miss Kavanaugh, a stenographer in his office, who transcribed the will as it was finally executed. It developed on the cross-examination of Mr. Able that he had been the friend of the testator for many years, and that he was also the friend of Lee Barbour, the father of the principal devisee. It further developed that Mr. Able was called on August 25, 1921, and informed that the testator desired to see him and wanted him to bring with him a notary public. Accompanied by Mrs. Hobbs, he, on August 27, 1921, went to the home of the testator, who informed him that he wished to deed the property to Alice Muriel Barbour. The deed was prepared, signed and acknowledged, but the description of the property was omitted from the deed, as they wanted to get the description from the county clerk's office. After its execution Mr. Able put the deed in the safe and the deed was never recorded, as the testator died that night.

The contestants, and a number of other witnesses who had had more or less association with the testator, expressed the opinion that the testator did not have testamentary capacity and gave the following facts as the basis of their opinion: He was old and feeble and had a far-away look in his eyes. He failed to recognize his two great-nephews, whom he had not seen for several years, and never in uniforms, which they were wearing at the time. Although when told by Edmund Wheeler that his name was Wheeler, he asked, "Which one, Jasper or Edmund?" Now and then he would give orders to his employes and afterward deny giving them. He was forgetful and would repeat things that he had said before, and would also jump from one subject to another. On one occasion he forgot a telephone number, and at another time he failed to remember attending a dance at the home of one of the witnesses when they were children. He boasted of his strength and ability to do things

that only a young man could do.  He showed his picture to two men who knew him, and also to three strangers, and asked them if that was not a fine looking old man. Sometimes when sitting out in front of the house he would jump up suddenly, go away and return without making an explanation.  Several years ago he sold a portion of his farm for less than one witness thought it was worth, and later on claimed to another witness that the farm was worth more than the witness thought it was worth. In discussing the weather on one occasion he said that they were in for a long dry spell, but stated fifteen minutes later that it was going to rain before night.  At times he was heard talking to himself and was also seen out in the back yard with his hands above his head.  He was seen in the city one day, and when asked what he was doing there he said, ''Ah,'' and just laughed.  At another time he stated that he had been in three barber shops and could not find anybody to shave him.  He promised to give Philip Broyles a bedstead, but subsequently sold it.

In determining the question of testamentary capacity the test is, did the testator at the time of the execution of the will have such mental capacity as to enable him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own? Watson's Exor. v. Watson, 137 Ky. 25, 121 S. W. 626. Evidence, within the meaning of the rule requiring questions of fact to be submitted to the jury, if supported by a scintilla of evidence, is something of substance, and not mere vague, uncertain, or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction.  Clark v. Young's Admrx., 146 Ky. 377, 142 S. W. 1032; Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134.  It is also the rule that where the facts relied on are insufficient to show mental incapacity, the opinions of the witnesses based thereon are likewise insufficient for that purpose.  Schrodt's Exor. v. Schrodt, 181 Ky. 174, 203 S. W. 1051.  It is at once apparent that such is the case before us.  All the circumstances and facts relied on by the witnesses may be true, and yet the testator have been fully capable of making a will.  Indeed, they are such as occur daily in the life of every normal man, and we must either hold them insufficient to show testamentary incapacity or adopt the rule that no man, however strong-minded he may be, can make a will, a position which we are not prepared to take.  But, it is argued that the evi-

dence of a physician, who went to see the testator for the purpose of collecting a bill for services rendered testator's brother, was sufficient to take the case to the jury. If the physician had expressed an unqualified opinion that the testator was of unsound mind, a different case would be presented, but on cross-examination he admitted that the testator had sufficient mind and memory to enable him to understand and do everything necessary in the making of a valid will, and thus neutralized the effect of the uncertain opinion that he had given. Newman v. Dixon Bank & Trust Co., Exor., 205 Ky. 31, 265 S. W. 456. We, therefore, conclude that the evidence of testamentary incapacity was insufficient to take the case to the jury.

But the point is made that the case should have gone to the jury on the question of undue influence. The basis of this contention is, that Mr. Able was the friend of Lee Barbour, the father of Alice Muriel Barbour, and the fact that he displayed so much interest in the execution of the will as well as in the preparation of the deed by the testator just before his death, was sufficient to show that the testator was a victim of his influence. Not only does the evidence fail to show that Mr. Able ever exercised any dominion whatever over the testator, but there is an entire absence of facts from which it could be inferred that he even suggested to the testator how his will should be written.

On the whole, we conclude that the court did not err in directing the jury to find for the will.

Judgment affirmed.