## Tombragel et al. v. Tombragel's Executor and Trustee.

(Decided January 21, 1930.)

494

[redacted]

HUBBARD SCHWARTZ and H. O. WILLIAMS for appellants.

JACKSON & WOODWARD, A. L. INSKEEP and J. R. UDRY, guardians ad litem, for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

Henry Tombragel left as his heirs at law four sons and two grandchildren, the children of a deceased daughter. They all contested his will, by which he bequeathed to each of his sons and the two children of his daughter $5 each, and he left all the rest of his property to the People's Savings Bank & Trust Company of Covington in trust until his youngest grandchild, Gilbert Tombragel, Jr., became of age, the bank to pay his son Albert Tombragel the interest on the trust fund until then, and the remainder of the estate to pass to his three grandchildren, Gilbert Tombragel, Jr., Vera Tombragel, and Mildred Tombragel. Vera and Mildred were the children of Charles Tombragel. Gilbert Tombragel, Jr., was the child of Gilbert Tombragel, who had a daughter Janet who was left nothing. At the conclusion of all the evidence in the circuit court, the court instructed the jury peremptorily to find the paper to be the will of Henry Tombragel. The contestants appeal.

Henry Tombragel's wife died on March 18, 1927. He had been in bad health for some time before his wife died. The will in contest was made on February 21, 1928. He was then 75 years old. He died on September 29, 1928. On September 18, 1928, he was admitted to the hospital, where he died 11 days later. Dr. Brumback, who examined him when he was admitted to the hospital, and then took from him a history of his case, testified that he was then anemic, his skin had a hardened yellow

color, and he seemed very feeble. He had an enlarged heart; his heart sounds were not strong; he had a heart murmur, which is significant of a weak heart. His chest was ball-shaped; his blood vessels were very much hardened. His lower extremities were swollen, and, on pressure, the print remained, which is significant of fluid in the tissues due to kidney disease or heart disease, or both. His arteries were very much hardened. He told the doctor that he had been suffering from swelling of the feet and fingers about a year, but that the condition was not continuous until during the past 6 months before entering the hospital. He was suffering from arteriosclerosis. The disease he suffered from causes degeneration of the brain. From his condition when the doctor examined him and the history of the disease, as given the doctor by him, the doctor testified that in his judgment he was not capable to make a will in February, 1927, or at the time the will was executed. The doctor had not seen him at that time, and only gave this as his opinion from the diseased condition he found and his judgment as to the course of the disease. Another physician, who did not treat the testator, on hypothetical questions submitting the facts, gave the same testimony as an expert, and said it was a progressive disease producing degeneration.

The doctor who had treated the patient before he came to the hospital was dead, and so his testimony could not be obtained. John Tombragel, a brother of the deceased, who had known him intimately all his life, and was in no wise interested, testified that his health was not good after his wife died. He came to the witness's house often; that he was never pleased with a meal, but at the same time he would eat a hearty meal; that he seemed to be melancholy right after his wife died; he talked very foolish about everything; he would come to the witness's house and take off the lids and look down in the pot and say, "I don't like it," but, when it was time to eat, he would sit there and eat as hearty as anybody. He was talking foolish over six months before he died.

Clarence Dinzer testified that he acted strange; that he would come to his house and just say "hello," and, after he had said this he would go out in the yard and walk up and down and would not have anything to say to anybody. This began after his wife died. He never came there but what he was always out of sorts. One

morning he came in laughing and he says: "Well I made an awful foolish will and when they see it they will all laugh." He said Mr. Petit made the will and laughed and said, "You will change that before you die."

Gilbert Tombragel testified that after his wife died it looked like he was not satisfied anywhere. He would not rest anywhere; he was not satisfied with the cooking or anything, and he was kind of flighty.

Charles Tombragel makes this statement as to his father: "He suffered a great deal from kidney trouble. He complained of his back hurting him all the time and wanted to lay down and rest and sleep. This continued during the last two years of his life. I don't think his mind was just exactly right. He just acted like a person —he wasn't really out of his mind but you couldn't handle him. We tried to please him the best we could but we never could satisfy pop after mom died. It looked like he was lonesome. He would be with one boy for a while and then he would stay with another boy for a while. You couldn't please him at all. He wouldn't tell us where he was going and we were worried about him when he went away. He wanted to be mostly by himself and sleep most of the time. This had not been his way of doing before mom died. He would eat his breakfast and the first thing you knew he would put on his hat and coat and walk away from the farm. When he would come back we would say 'pop where was you?' Sometimes he would answer you in a nice way and another time he would answer us hateful. He would say 'it is none of your business.' We would try every which way in the world to satisfy him. Gave him everything he wanted and cooked special dishes for him and he would turn them down."

The other children and a number of other witnesses gave similar testimony. They also testified that he would get up in the morning early and go away and be gone all day without saying anything to anybody, and they would not know where he was; that at other times he would sleep all day, and was always complaining of what was on the table; that he had been sick and going down over a year; and that all his life before this he was not thus. These people who lived with him and knew him well all gave it as their opinion that he had not such mental capacity as to enable him to know the natural objects of his bounty or his obligations to them and dispose of his estate according to a fixed purpose of his

own, although he knew the character and value of his estate. He was on perfectly good terms with his children, and in fact lived first with one and then the other from the time his wife died until he went to the hospital. There was no breach in the families. The other sons had worked on the farm and lived nearby. Albert, when 17 years old, had gone north, and had not been home much until about the time his mother died, when he came home and stayed about a month. He was unmarried. The grandchildren were all minors, or practically so, and no reason is assigned in the evidence as the basis for the testator making the will as he did.

On the other hand, the contestees proved by a number of persons who knew him well that there was nothing wrong with his mind, and that he was fully competent to make a will.

Section 4850, Kentucky Statutes, provides.

"An appeal may be taken from the county court to the circuit court of the same county and thence to the court of appeals from every judgment admitting a will to record or rejecting it. The circuit court shall try both law and fact unless a jury be required. The court of appeals shall not hear any matter of fact pertaining thereto other than such as may be certified from the circuit court; and the same effect shall be given to the verdict of a jury in a will case as is given to the verdict of a jury in other civil cases."

Under this statute, when a jury trial is had in the circuit court, the case is governed by the same rules that apply to other jury trials, and the same effect shall be given to the verdict of the jury as is given to the verdict of a jury in other civil cases. It is the well settled rule in Kentucky that, if there is any evidence establishing the plaintiff's case, the court should not give a peremptory instruction, although the judge should be of the opinion that, if the jury found adversely, he would be compelled to grant a new trial. Thompson v. Thompson, 17 B. Mon. 22; Buford v. L. & N. R. R. Co., 82 Ky. 286; Curran v. Stein, 110 Ky. 99, 60 S. W. 839, 22 Ky. Law Rep. 1575; L. & I. Railway Co. v. Roemmele, 157 Ky. 84, 162 S. W. 547; Berry v. Moore, 220 Ky. 619, 295 S. W. 885.

The testimony of Dr. Brumback was sufficient to take the case to the jury, for it cannot be said that, taking as

true the facts stated by him, there was no evidence of incapacity.

While the rule is that the opinions of nonexpert witnesses, unless based upon tangible facts, are insufficient alone to take the question of mental capacity to the jury (Baker v. Lemon, 192 Ky. 473, 233 S. W. 1050 and cases cited), we have here, in addition to the testimony of the nonexpert witnesses, the testimony of two expert witnesses. The case should therefore have been submitted to the jury. Whether under all the facts, including the provisions of the will, the evidence was sufficient to sustain a verdict, is a question not now presented and not decided. Persons, who knew the testator well, though nonexperts, may state their opinion as to his mental capacity. But the value of these opinions depends upon the facts upon which they rest. To illustrate, some of the witnesses say that the testator here talked foolishly, but they do not state the facts. On another trial the facts may be more fully brought out.

Judgment reversed, and cause remanded for a new trial.