## Dossenbach et al. v. Reidhar's Ex'x et al.

(Decided June 14, 1932.)

(Rehearing Denied Nov. 22, 1932.)

450

DAVID A. McCANDLESS, MORTON K. YONTS, WOODWARD, HAMILTON & HOBSON, JAMES P. EDWARDS, and WILLIAM T. McNALLY for appellants.

ALFRED SELLIGMAN, ROBERT T. BURKE, J. MATT CHILTON, WALLIS W. DOWNING, and SELLIGMAN, SELLIGMAN & GOLDSMITH for appellees.

J. J. KAVANAUGH and ARTHUR B. BENSINGER for Millet heirs.

ALLEN P. DODD for Liberty Bank & Trust Co.

OPINION OF THE COURT BY JUDGE WILLIS—Affirming.

Daniel F. Reidhar died on December 11, 1929, at the age of 79 years. His holographic will dated July 8, 1916, was promptly probated. A contest of the will was instituted by remote paternal relatives. The circuit court peremptorily instructed the jury to find for the will, and the contestants complain. The sole ground of attack upon the will was that Reidhar lacked testamentary capacity when he executed the instrument. The action of the circuit court is challenged upon the ground·that the evidence was sufficient to justify a submission of the case to the jury upon the issue of testamentary capacity. The rule in this jurisdiction is that a case must be submitted to the jury if there is any evidence tending to sustain the cause of action upon which

issue is joined. In determining that question, the court views the evidence in the aspect most favorable to the complaining party. Holliday v. Holliday, 161 Ky. 500, 171 S. W. 156; Palmer v. Smith, 211 Ky. 105, 276 S. W. 1055; Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788; Humphrey v. Neal, 199 Ky. 498, 251 S. W. 637; Mossbarger v. Mossbarger, 230 Ky. 230, 18 S. W. (2d) 997; Franzman's Ex'rs v. Nalty, 208 Ky. 686, 271 S. W. 1034; Wood v. Corcoran, 190 Ky. 621, 228 S. W. 32; Broyles v. Able, 208 Ky. 672, 271 S. W. 1040; Oder's Ex'r v. Webster, 224 Ky. 551, 6 S. W. (2d) 690; Tombragel v. Tombragel's Ex'r & Trustee, 232 Ky. 493, 23 S. W. (2d) 919, 920; Woodruff v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751. By the term "evidence" is included the facts proven and the inferences reasonably deducible therefrom. But a decision may not be rested upon unreal or remote inferences. A pyramiding of inferences is not regarded as sound reasoning, and is not a permissible predicate for a conclusion. Sutton v. L. & N. R. Co., 168 Ky. 81, 181 S. W. 938; National Surety Co. v. Redmon, 173 Ky. 297, 190 S. W. 1081; Siemer v. C. & O. Ry. Co., 180 Ky. 113, 201 S. W. 469; United States v. Ross, 92 U. S. 281, 23 L. Ed. 707; Broughton v. Congleton Lumber Co., 235 Ky. 534, 31 S. W. (2d) 903; Ferguson v. Billups, 244 Ky. 85, 50 S. W. (2d) 35, decided May 20, 1932. And the proven facts and legitimate inferences drawn therefrom must be something of substance and relevant consequence, carrying the quality of proof, and having fitness to induce conviction. Clark v. Young, 146 Ky. 377, 142 S. W. 1032; Crump v. Chenault, 154 Ky. 187, 156 S. W. 1053; Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134; Newman v. Dixon, B. & F. Co., 205 Ky. 31, 265 S. W. 456; Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840; Jones v. Beckley, 173 Ky. 841, 191 S. W. 627; Gay v. Gay, 183 Ky. 245, 209 S. W. 11.

The record is very large and we shall consider the testimony, for the sake of convenience and clarity, first in its separate phases, and then in its cumulative effect Testamentary capacity consists of mind and memory sufficient to know the natural objects of the testator's bounty and his duty to them, and to know the extent and character of his estate, to take a rational survey thereof, and to dispose of his property in accordance with a fixed purpose of his own. Meuth v. Meuth, 157

Ky. 784, 164 S. W. 63; Hagedorn v. Scott, 228 Ky. 582, 15 S. W. (2d) 479.

At the threshold stand the admitted and uncontradicted facts. The will was written by the testator thirteen years before his death. Its inherent character, structure, and effect are put forward as potent evidence of the capacity and character of the testator. It was written by the testator unaided, and constitutes a clear and concise expression of his wishes. It reads:

"I, Dan'l F. Reidhar, do hereby make this my last will and testament, hereby revoking all others heretofore made by me. I hereby give and devise to my Uncle, Louis P. Millet, absolutely, all personal property of which I may die possessed, except my stock in The German Insurance Bank, and the dividends on these stocks I devise to May Bush Raub during her lifetime and I direct my executor pay same to her free from the control of any husband she may have and at her death said stock to go absolutely to The St. Joseph's Orphans Home. All of my real estate of which I may die possessed I devise to my Uncle Louis P. Millet during his lifetime and at his death or my death if I survive him I direct that all of said real estate be sold upon such terms and in such manner by my executor, as it deems advisable, and the proceeds of same be distributed as follows, to wit: To the Masonic Widows & Orphans Home the sum of Two Thousand Dollars; to J. Matt Chilton One thousand dollars; and the balance I direct shall be equally divided among the St. Joseph's Orphans Home, St. Vincent Orphanage, the German Protestant Orphans Home, the Little Sisters of the Poor, share and share alike.

"I hereby appoint The Fidelity and Columbia Trust Company executor of this will and recommend the employment of E. J. McDermott and J. Matt Chilton as Atty's, whenever an attorney is needed.

"Witness my hand this 8th day of July, 1916.

"Dan'l F. Reidhar."

The contestants claim that the failure to provide for remote relatives of Reidhar who would inherit his

estate in case of intestacy is a token of incapacity calling for explanation, and, when considered in connection with other evidence, contains sufficient probative force to carry the case to the jury. Kevil v. Kevil, 2 Bush, 614; Zimlich v. Zimlich, 90 Ky. 657, 14 S. W. 837, 12 Ky. Law Rep. 589; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Meuth v. Meuth, 157 Ky. 784, 164 S. W. 63; Helm v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474; Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788; Hagedorn v. Scott, 228 Ky. 582, 15 S. W. (2d) 479; Moran v. Moran, 233 Ky. 526, 26 S. W. (2d) 565; Same case, second appeal, 238 Ky. 403, 38 S. W. (2d) 207.

The propounders assert that the will manifested due concern for the only relative near enough to have any reasonable claim on the bounty of Reidhar, and that this will is essentially and intrinsically the product of sound reasoning and competent consideration. Shelley v. Chilton, 236 Ky. 221, 32 S. W. (2d) 974; Langford v. Miles, 189 Ky. 515, 225 S. W. 246; Wigginton v. Wigginton, 194 Ky. 385, 239 S. W. 455; Lee v. Kirby, 186 Ky. 603, 217 S. W. 895. Provision was made by the will for an uncle who lived with the testator and who was the only relative closely associated with the testator, although a nephew visited him frequently. It made bequests to two personal friends. The residue of the estate was devoted ultimately to worthy objects of charity. Reidhar was 66 years of age when he executed his will. He lived thirteen years thereafter, but made no changes therein, or any additions thereto. He seemed to be satisfied with what he had done. The business life of Reidhar began when he was a young man. His father was president of a bank, and Reidhar was employed in a minor position at the institution. From the earliest annals of his history, Reidhar was abstemious in his habits, economical in his mode of life, and exact in his business transactions. He was thrifty to an extreme degree. His father left a substantial estate to Reidhar and his sister. The two children resided in the parental home and maintained it practically without change. His sister devised her heritage to Reidhar, and with the combined capital he built up an estate in excess of $700,000. It was not the mere accretions of savings, but the result of prudent investment and reinvestment in real estate which appreciated in value. The achievement was in itself an indication of no mean financial ability. Reidhar's social life was

limited, apparently, and was not especially significant. He was a bachelor, and after the death of his sister maintained the home alone. A favorite maternal uncle, somewhat older than Reidhar, lived with him. He was the Louis P. Millet mentioned in the will. Several witnesses testified to a friendship with the testator reaching back to boyhood. Whilst some of the witnesses did not believe that he ever gave anything to charity, and thought that he was extremely close in money matters, if not miserly, it cropped out that Reidhar had helped to educate a needy relative; that he had contributed to various charities; that he had sent money to his relatives abroad; that he was considerate of those associated with him, and loyal to every social, personal, and legal obligation. The evidence tends to show that the testator was a quiet and unostentatious man, obsessed with his occupation, but several instances illustrate his humanity, his appreciation of friends, and his recognition of social duties. He had some maternal relatives to whom he was particularly devoted. His paternal relatives for the most part lived abroad and were unknown to him. The two relatives on the Reidhar side that lived in Louisville had displayed no interest in his life and had not established or maintained contact with him. He manifested no aversion to any of them, but was simply unacquainted with them.

These admitted facts constitute the background of the case, to which the testimony was addressed, and which must be kept in mind when the testimony is considered. A great number of witnesses testified, but the facts related were disconnected, isolated, and trivial, and without probative value on the subject of testamentary capacity. Robinson v. Paxton, 210 Ky. 575, 276 S. W. 500. It would be useless to incumber this opinion with a recitation of them. The type will fully appear in the hypothetical question submitted to the expert witnesses, presently to be set forth. The opinions of the witnesses to the effect that Mr. Reidhar lacked testamentary capacity were based on impressions, incidents and circumstances which did not authorize the conclusions expressed. They related to his manner of dress, his thrift, his frugal habits of living, his self-denial, and his obvious desire to save money and to accumulate property. He chose to do without things which he might have afforded, and which others in his circumstances might have enjoyed, but he pre-

ferred simple and inexpensive modes of enjoyment. Such things were mere matters of taste, and amounted to nothing more than a difference of opinion between the testator and the witnesses as to what was appropriate to a man in his circumstances. Differences in taste among those in similar circumstances proves nothing respecting their relative mental capacities. Indeed, taste, according to Burke, is a "delicate and ærial faculty, which seems too volatile to endure even the chains of a definition, and cannot be properly tried by any test, nor regulated by any standard." It is not shown what Reidhar's income was at any period, or what proportion of it was consumed in maintaining his establishment. It is not shown that his income and expenses were ever unreasonably disproportionate. Some of the incidents related occurred many years ago at a time when Reidhar did not have any considerable property or any substantial income. His investments in real estate were made with a view to future enhancement in value, and none of it produced large returns. The taxes were a severe burden on the rentals realized. No witness stated a single fact, repeated a single utterance, or described a single transaction that indicated unsoundness of mind. Reidhar labored under no delusions, he rendered no erroneous decisions on any business matter, and his only variance from the normal life of a successful business man was his single-minded concentration on his business and his apparent contentment with meager and modest personal indulgences and adornment. Some of the witnesses said he wore cheap clothing for long periods and did not keep himself clean, while other testimony tended to show the contrary. Such matters in any event did not concern his mental capacity, but reflected merely his taste and culture. Cf. Smith v. Smith, 243 Ky. 241, 47 S. W. (2d) 1306. In Cecil v. Anhier, 176 Ky. 198, 195 S. W. 837, 846, a New Jersey case was thus quoted:

> "Miserly disposition and habits, unclean modes of life, dishonesty, even to theft, profanity and violence of temper, of themselves do not affect the claim to testamentary capacity; for obviously a man may be a thief, a miser, unclean, profane, and of ungovernable temper, and yet have testamentary capacity."

In re Lewis' Will, 33 N. J. Eq. 227.

It. is the accepted rule in this jurisdiction that the opinions of witnesses constitute competent evidence in will cases, but such opinions will not be sufficient evidence to take a case to the jury, unless the facts upon which the opinions are based are such as tend to establish a lack of testamentary capacity. Wigginton v. Wigginton, 194 Ky. 385, 239 S. W. 455; Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840; Schrodt v. Schrodt, 181 Ky. 174; Burdon v. Burdon, 225 Ky. 480, 9 S. W. (2d) 220. In Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788, 790, it was said:

> "If the facts detailed by the witnesses on which they base their opinions simply show acts of conduct not out of line with the course of acts and conduct usually pursued by mankind, the opinion of the witnesses would be overcome by the statement of facts on which the opinion was based, and would be worthy of little or no consideration. Wood v. Corcoran, 190 Ky. 621, 228 S. W. 32; Langford v. Miles, 189 Ky. 515, 225 S. W. 246."

The appellants, however, do not rely solely upon the nonexpert witnesses, but insist that such testimony is corroborative of the testimony of several expert witnesses offered by them. Four doctors testified in favor of the appellants.

Dr. Wilmoth, a surgeon and gynecologist, who did not know the testator, was asked this question:

> "Assuming that Daniel F. Reidhar died December 17, 1929—then seventy-nine years of age, that he was born and reared in Louisville, Kentucky, most of his father's relatives lived in Europe, he never was in his father's native country but once, that was when he was 21 years or twenty-two years of age. His father sent him over there at his father's expense; that he never engaged in any business during his father's life except that he stayed in a bank of which his father was President; had a clerical position in the bank; when a young man he would go with some of his associates visiting places in the city of Louisville, but he never would contribute anything whatever to any expenses that might be necessary for the pleasure of the company, refusing to bear his part of the

purchase of candy to take to the young ladies where they would be calling. He was always from his earliest childhood, up until his death, extremely close in financial matters and he never had any property of his own until after his father's death when he inherited half of his father's estate which was very large; and that after coming in possession of that estate he was extremely penurious and so continued throughout his life; that whenever persons would talk to him and engage him in conversation, he would begin to talk about saving money; then when talked to by some friends about 'taking a trip' he said 'No, I have not money enough to make a trip.'

"At one time he owned a horse and buggy for a short while and sold it saying it was too expensive to keep a horse and buggy. This occurred before the advent of the automobile. After the automobile came into use he purchased one and sold it within a few months thereafter, stating that it was entirely too expensive to have an automobile. He was so penurious that many of his friends and acquaintances denominated him as a 'Miser.' He would advise persons with whom he associated to reduce their expenses and save money. He was a man who weighed 140 pounds, 5 feet and 10 inches high. For twenty years or more before his death he walked with a shuffling walk and in a stooped position. He dressed in old and worn clothes which were dirty, his body was dirty and his underwear was dirty. His dress was of such a character that he was spoken of 'that he looked like a tramp.' His clothing was of old make probably 15 to 20 years old and well worn. He did not consume a sufficient amount of nourishing food to feed his body and often complained of some trouble with his stomach. He not only inherited an estate from his father, but also the other half of his father's estate from his sister who died in 1921 and also received a large sum of money from the estate of a third or fourth cousin, Miss Rose Millet, amounting to approximately $50,000.

"The only business that he ever engaged in after his father's death was to buy and sell some real estate through real estate agents. He inherited from his father considerable real estate, col-

lected his own rents and would walk from Third and Broadway where he lived down to Portland to collect his rent on real estate and would walk back, stating that he did that to save street car fare. His visit to his relatives in Europe was 1873. While in Europe in 1873, he visited his father's birthplace as heretofore stated, at his father's expense and visited the town of Baar, Canton Zug, Switzerland; met his relations of the same name as his own who were related to both him and his father. About the time before and after July 8, 1916, he frequently stated that he had no relatives whatever on his father's side; that the only relatives he had were the Millets. When asked what he was accumulating so much property for he stated that he was accumulating it for the Millets, it was seldom ever known that he contributed anything to charity, if so, an extremely small amount. At the death of Mr. Reidhar, he left an estate of $750,000 or more. In your opinion did he, on the 8th day of July, 1916, have mind and memory sufficient to know his estate, of what it consisted, and to take a rational survey thereof, to know his relations, the natural objects of his bounty and his duty to them, and to dispose of his estate according to a fixed purpose of his own?"

The doctor answered:

"Because this man represented a type of people who are self-centered, the egocentric type of people who can only see themselves and can only see such things as relate to themselves. They are not interested in anyone else. It is a form of delusion, it carries with it the idea of poverty, and goes a little further and gets to be the so-called kleptomania. A kleptomaniac will pick up anything and the highest type of this is illustrated in the beggar, give me, give me, they want everything they see because they are the highest type of egocentric individuals."

It will be observed that the hypothetical question was based on scattered incidents detailed by many witnesses, covering isolated and widely separated occasions, and presented no question of science or medical skill. Barrett v. Brand, 179 Ky. 740, 201 S. W. 331; Gay v. Gay, 183 Ky. 238, 209 S. W. 11.

The answer of the doctor was not responsive to the

question, it bore no rational relation to the subject involved, and it added no probative weight to the circumstances upon which it was predicated. Newman v. Dixon B. & T. Co., 205 Ky. 31, 265 S. W. 456; Cecil v. Anhier, 176 Ky. 198, 195 S. W. 837; Broyles v. Able, 208 Ky. 672, 271 S. W. 1040; Bush v. Lisle, 89 Ky. 393, 12 S. W. 762, 11 Ky. Law Rep. 708; Langford v. Miles, 189 Ky. 515, 225 S. W. 246.

Dr. Wallace saw the testator a few times while treating a sick relative in whom Reidhar was much interested. The latter pulled his chair up so that he could hear the conversation between the doctor and the patient. Upon this circumstance the doctor expressed an opinion that Reidhar was not likely to be a person of sound reasoning. He added that he formed an unfavorable impression of the man's appearance and conduct. Certainly the incident furnished no reasonable basis for the doctor's conclusion, and the conclusion itself constituted no evidence of the mental impairment of Reidhar.

Dr. Pirkey became acquainted with the testator in 1924, when he was treating a servant in the house. He later treated Louis Millet, the uncle of the testator, who lived with him, for injuries suffered in an automobile accident, probably in 1925. Reidhar, in 1927, had heart trouble and hypertension, although, as the doctor admitted, his blood pressure was not high for a man of his age. Dr. Pirkey had no conversation with Reidhar, but observed the living conditions in his home. They were about what could be expected where two old bachelors lived. The furniture was of antique type and worth a lot of money. They had servants and a plentiful supply of household conveniences. The doctor had previously made a statement, based on his observations in 1925, that he thought Mr. Reidhar was able to make a will in 1916. He said that Mr. Reidhar seemed to be a man of good appearance, clean in his person and dress, and friendly in his contacts. He displayed active interest in the welfare of a servant, who had suffered paralysis, and took care of the expense. He did not by act or word or otherwise indicate any impairment or unsoundness of mind. Reidhar was difficult to treat because he was reluctant to take medicine, a matter upon which there was no material difference between the testator and many other people whose sanity would be conceded. The doctor expressed the

opinion that, when he visited the home in 1923, Reidhar was in full possession of his faculties. The opinion of the doctor expressed at the trial that Reidhar lacked testamentary capacity in 1916 was based on observations made many years later. The factors mentioned to justify the opinion were wholly insufficient for the purpose, but, if it should be conceded that they were adequate when observed, they were not connected with conditions existing when the will was written. The doctor did not refer to any diseased condition of long standing that must have impaired testamentary capacity back in 1916. Cf. Tombragel v. Tombragel, 232 Ky. 493, 23 S. W. (2d) 919. Indeed, the only disease mentioned in 1927 did not affect his mental power, even if he had it then.

Dr. Goodman knew the testator for thirty-five or forty years. He met him frequently on the street and at a drug store, and occasionally Reidhar would make a friendly call. He regarded Reidhar as a man of low intelligence, poorly educated. He never complained of any disease or ailment. He was not a robust man and appeared to be poorly nourished. His conversation generally ran along the line of saving money, but not a word of his was quoted. In answer to a question as to testamentary capacity the witness said: ''I regarded Mr. Reidhar as a man of extremely miserly habits. He was eccentric, he was without affection. I doubt very much whether he had the capacity of knowing or realizing the extent of the property which he had.''
His observations were not based upon scientific matters, but upon the same character of conduct as were the opinions of the nonexpert witnesses. It was not such an unequivocal opinion of an informed expert as constituted a scintilla of substantive evidence. Thompson v. Jordan, 222 Ky. 788, 2 S. W. (2d) 640; Newman v. Dixon Bank & Trust Co., 205 Ky. 31, 265 S. W. 456; Humphrey v. Neal, 199 Ky. 498, 251 S. W. 637; Bush v. Lisle, 89 Ky. 393, 12 S. W. 762, 11 Ky. Law Rep. 708; Langford v. Miles, 189 Ky. 515, 225 S. W. 246.

Dr. Curran Pope testified that Mr. Reidhar consulted him in 1908, and, before submitting to treatment, exacted an understanding as to the fees that would be charged. It is not shown what income Reidhar then had. The fees were agreed upon, and Dr. Pope, or his assistant, treated him for several weeks for constipa-

tion and indigestion. Dr. Pope did not examine Reidhar, but concluded that he was a miser and that a miser did not possess testamentary capacity. He related an incident regarding the rental value of property, showing that Reidhar was well advised upon such matters. He said Reidhar was reluctant to take his advice or his medicine. Dr. Pope said Reidhar was a pathological or diseased person, and also stated that he considered that he had a pathological or diseased mind. He explained, however, that he reached that conclusion solely because he regarded him as a miser, and that his whole mentality was governed by that complex. He expressed the view that Reidhar had a low intellect, and the mind of a child. He characterized hin1 as coldblooded and lacking in affection, and said that he did not think such a man could take a rational survey of his property, properly consider his relatives, or suitably perform the difficult duties of disposing of a large estate. His opinions were based solely on the circumstances that he remembered and related.

Dr. Pope defined a miser, as he used the word, as one "whose personality, whose physical body, whose mind is governed entirely by money, and not money in the sense that it is to be used properly, but just for the sake of money itself, for the getting of money." Dr. Pope was asked, "What effect does a miserly disposition and nature in your opinion have upon the capacity to make a will according to the standard I have given you?" The doctor answered:

"Miserliness warps all of the better characteristics of a human being. When a man, as I look at it, debases himself to the extent that he is willing to deprive his heart, to deprive his mind of all the pleasures that he might have in this life, whose sole thought is money, whose idea of affection is small, who is coldblooded, I don't believe that that man can know his estate as he should know it, I don't think he can recognize the demands of his relatives upon him. I don't think he can under those circumstances take a rational survey of his estate and dispose of it as he should. I believe the mind of a man who is governed absolutely by money becomes so warped that he is wrong—he is abnormal—he has an unhealthy mind and he is not capable of performing the necessary and sometimes very difficult duties of disposing of a very large estate."

Dr. Pope's opinion was that Reidhar was a miser, and that a miser, as he defined the word, did not possess capacity to make a will. He specified all the grounds for the formation of his opinion, and left nothing to conjecture. The opinion of Dr. Pope and the facts upon which it was based threw no light on the testamentary capacity of the testator. His theories related to supposititious characters which he described and were not sustained by facts observed or proven respecting Reidhar.

The opinions of expert witnesses upon subjects of common knowledge have no more probative value than the opinions of other witnesses. In dealing with insanity, or disease, expert opinion is accepted as a matter of necessity (Louisville & N. R. R. Co. v. Rowland, 227 Ky. 849, 14 S. W. [2d] 174), but, when an expert's opinion is rested upon the simple facts of life and everyday occurrences, it possesses no more weight or value than that of any other intelligent person. Upon matters of common knowledge and everyday experiences, the ordinarily intelligent man can make the appropriate deductions and derive the correct conclusions, and no basis exists for the expatiation of an expert. Gay v. Gay, 183 Ky. 238, 209 S. W. 11; Barrett v. Brand, 179 Ky. 740, 201 S. W. 331; Moore on Facts, sec. 1245, p. 1384. There was no fact stated in the testimony of Dr. Pope tending to show that Mr. Reidhar did not have testamentary capacity when he wrote his will in 1916. His opinions rested upon incidents or acts not incompatible with a rational mind. Humphrey v. Neal, 199 Ky. 498, 251 S. W. 637. Such an opinion added no probative value to the facts given. Berry v. Safe Deposit, etc., Co., 96 Md. 45, 53 A. 720.

It remains to consider the cumulative effect of the evidence. It is argued that the jury might have determined testamentary incapacity from the combined effect of the evidence when the individual instances were not sufficient for that purpose. It is quite true that the cumulative effect of evidence as a whole may be greater than the individual items of which it is composed. Hagedorn v. Scott, 228 Ky. 582, 15 S. W. (2d) 479; Addison v. Wilson, 238 Ky. 143, 37 S. W. (2d) 7; Sheeran v. Jarboe, 190 Ky. 840, 229 S. W. 111; Union Pacific Ry. Co. v. Hadley, 246 U. S. 330, 38 S. Ct. 318, 62 L. Ed. 751. But the mere multiplication of unsup-

ported opinions, based on isolated and disconnected facts without probative weight, adds nothing to the strength of a case. Something cannot be made out of nothing. Poll v. Patterson, 178 Ky. 23, 198 S. W. 567; Gay v. Gay, 183 Ky. 238, 209 S. W. 11; Cecil v. Oertel Co., 239 Ky. 825, 40 S. W. (2d) 328; Burdon v. Burdon, 225 Ky. 480, 9 S. W. (2d) 220; Standard Accident Ins. Co. v. Strunk, 220 Ky. 256, 294 S. W. 1085.

The principle was strikingly stated by the Maryland Supreme Court in these words:

"The sum of any number of zeros will always be zero, and this is true in the law of evidence as well as in arithmetic. You may combine as many independent circumstances as you please, and, if no one of them has any legal tendency to establish the fact to be proved, then all of them taken together can have no greater probative value. If each proves nothing, all can prove no more. To assert the contrary is to state that the aggregation of a number of incompetent facts is, by force of that mere aggregation sufficient to establish a result which no one of the same facts considered by itself has even the remotest tendency to prove."

Berry v. Safe Deposit, etc., Co., 96 Md. 45, 53 A. 720, 724.

The cumulative effect of the testimony in the case tends to show that the testator lived an abstemious and simple life, without indulging in excesses of any kind. Although he denied himself, he was not a miser, for it was not shown that he was covetous, or grasping, or mean, or sordidly avaricious, or that he lived miserably to save and to increase his hoard. See Webster's New International Dictionary. He was distinctly a business man and not a hoarder of gold. He desired to make money by the use of his capital and the exercise of his talents. He speculated in real estate and other property, expecting values to advance. He associated constantly with business men; he maintained lifelong friendships; he sought diligently at the proper places for information respecting values; and he wisely disposed of property, as opportunity was offered. The prime consideration with him in a venture was not immediate income on the investment, but the prospect of enhancement in value. His judgment in every instance shown by this record was vindicated by the event. Much

of his estate was created by sales and reinvestment, and by increases in the value of land. His estate was not derived solely from savings, but it was the fruit of foresight, investigation, and sagacity in the business of investment. He sometimes said to people who solicited him to give or to spend money that he was poor or not able to do as they suggested or desired. It is not unusual for people in similar circumstances to give similar answers when they desire not to respond to the particular solicitation. Such answers furnished no token of unsoundness of mind, or of delusions of poverty.

We find no act, fact, condition, or circumstance, either alone, or in the cumulative effect of the aggregate, to indicate that Reidhar did not have testamentary capacity. He lived a long life without disease or any serious illness until the fatal brief attack. His will had been written and preserved for thirteen years before he died. His business ventures were successful, and his care and consideration for those about him was normal, at least. Numerous incidents related in this record, as well as the terms of his will, evince appreciation and remembrance of friends. A practice of life-long self-denial in order to do good for others is certainly no sign of a deficient mind or of a basely avaricious character. "The lamp that burns by night dries up his oil to lend the world his light." It is clear from the evidence in this case that Daniel Reidhar deliberately chose a simple life of self-denial, thrift, and frugality by which he was enabled to create a large estate and at his death to make a notable contribution to the charities of his choice. If that was eccentric, it certainly was not such eccentricity as destroyed testamentary capacity.

Reidhar suffered from no disease and exhibited no mental or physical defect or infirmity. He manifested no antipathy, aversion, or prejudice against any of his relatives, and showed no insane delusions upon any subject.

Many cases are cited, but the appellants rely particularly upon the cases of McDonald v. McDonald, 120 Ky. 217, 85 S. W. 1084, 27 Ky. Law Rep. 607, 117 Am. St. Rep. 579, Meuth v. Meuth, 157 Ky. 784, 164 S. W. 63, and Woodruff v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751, as authorities for the position that extreme

466

hatred, unfounded bitterness, and violent temper towards children by a parent may afford evidence of incapacity of such a testator to know and appreciate the natural objects of his bounty.

Here the testator was a bachelor without dependents or near relations, and it was not shown that he had any hatreds or aversions or temper toward his relatives, or toward any one else. The present case is not within the reason or the range of the authorities upon that subject, which are addressed to circumstances showing unfilial conduct in an unnatural degree.

When the voluminous testimony is sifted not a scintilla of substance is found of sufficient probative value to take the issue of testamentary capacity to the jury.

It follows that the circuit court correctly decided the contest when it directed a verdict in favor of the will.

The judgment is affirmed.